# 23-10436

# United States Court of Appeals

*for the*

# Eleventh Circuit

---

PETER JANG, ERIK CHAVEZ,

*Plaintiffs/Appellants,*

– v. –

APEX CLEARING CORPORATION,

*Defendant/Appellee.*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO: 1:21-md-02989-CMA
(Hon. Cecilia M. Altonaga)

# INITIAL BRIEF OF APPELLANTS

PETER SAFIRSTEIN
SAFIRSTEIN LAW LLC
45 N. Broad Street, Suite 100
Ridgewood, NJ 07450
(917) 952-9458

GARY S. GRAIFMAN
DANIEL C. EDELMAN
KANTROWITZ, GOLDHAMER &
GRAIFMAN, P.C.
16 Squadron Boulevard, Suite 106
New York, NY 10956
(845) 356-2570

RACHEL WAGNER FURST
MADERAL BYRNE & FURST PLLC
2800 Ponce de Leon Boulevard, Suite 1100
Coral Gables, FL 33134
(305) 520-5690

*Counsel for Plaintiffs/Appellants*



**AMENDED CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**


Altonaga, Cecilia M. (Chief U.S. District. Judge, Southern District of Florida)

Apex Clearing Corporation

Apex Fintech Solutions Inc.

Burke, Heather Marie

Chavez, Erik

Daker, Angela

Edelman, Daniel C.

Furst, Rachel W.

Gant, Bryan Daniel

Gidley, John Mark

Graifman, Gary S.

Grossman Roth Yaffa Cohen, P.A.

Kantrowitz, Goldhamer & Graifman P.C.

Jang, Peter

Maderal Byrne & Furst PLLC

Pace, Jack E.

PEAK6 Investments LLC

Safirstein Law LLC

Safirstein, Peter

Schofield, Lorna G. (U.S. District Judge, Southern District of New York)

White & Case LLP

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully request oral argument. This appeal presents, among other things, the substantial questions of whether stockbrokers, including clearing brokers, owe any duties under the circumstances at issue in this litigation. Appellants respectfully submit that the decisional process will be aided by the Court's opportunity to question the parties regarding their arguments.

# TABLE OF CONTENTS

**Page**

AMENDED CERTIFICATE OF INTERESTED PERSONS
    AND CORPORATE DISCLOSURE STATEMENT ................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................i

TABLE OF AUTHORITIES ..............................................................................iv

STATEMENT OF JURISDICTION.......................................................................1

STATEMENT OF ISSUES ...................................................................................1

INTRODUCTION ................................................................................................2

STATEMENT OF THE CASE...............................................................................5

    I.      STATEMENT OF FACTS.......................................................................5

          A.      Background on Apex ...................................................................5

                1.      Apex Is a Stockbroker and a Clearing Broker.................5

                2.      Apex Is a Regulated Broker-Dealer, Not A
                        Regulated Securities Clearinghouse ..................................6

                3.      As a Securities Broker-Dealer and as a Clearing
                        Broker-Dealer, Apex Is Subject to Industry
                        Standards of Care.................................................................8

          B.      The Relevant Market Events of January 2021.........................11

          C.      Apex Locks The Gate With Its One-Way Market
                Suspension ................................................................................13

    II.     COURSE OF PROCEEDINGS BELOW ...........................................16

    III.    STANDARD OF REVIEW ...............................................................19

SUMMARY OF ARGUMENT ...........................................................................19

ARGUMENT .....................................................................................................22

    I.      PLAINTIFFS STATE A VIABLE CLAIM FOR
          NEGLIGENCE UNDER NEW YORK LAW ...................................22

A.     Apex As a Broker-Dealer Owed Plaintiffs Duties of Care Commensurate With Those of Other Professionals ............................................................... 23

B.     New York Courts Have Recognized That Broker-Dealers Owe a Duty to Customers and May Be Held Liable for Negligence Under New York Law .......................... 28

C.     Apex Does Not Escape Liability Because It Is A Clearing Broker-Dealer ............................................................. 30

D.     The "Economic Loss Doctrine" Is Not a Bar to Plaintiffs' Recovery Under New York Law ............................. 35

E.     To The Extent A Special Relationship is Required It was Properly Pled ........................................................ 41

II.     THE MDL COURT ERRED IN DISMISSING PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM ............. 42

III.     THE MDL COURT ERRED IN DISMISSING PLAINTIFFS' ALTERNATIVE BREACH OF GOOD FAITH AND FAIR DEALING CLAIMS .......................................... 50

IV.     THE MDL COURT ERRED IN DISMISSING PLAINTIFFS' ALTERNATIVE CLAIM FOR TORTIOUS INTERFERENCE ............................................................... 54

CONCLUSION ....................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*,
No. 97-4978-Civ, 2002 WL 88226 (S.D.N.Y. Jan. 23, 2002)..............................49

*Ambac Assur. Corp. v. U.S. Bank N.A.*,
2022 U.S. Dist. LEXIS 179380 (SDNY, Sept. 30, 2022) ....................................39

*AMBAC Assurance Corp. v. U.S. Bank Nat'l Ass'n*,
328 F. Supp. 3d 141 (S.D.N.Y. 2018) ......................................................... *passim*

*Berwecky v. Bear Stearns & Co.*,
197 F.R.D. 65 (S.D.N.Y. 2000) ............................................................................33

*Cannizaro v Bache, Halsey, Stuart, Shields, Inc.*,
81 F.R.D. 719 (S.D.N.Y. 1979) ............................................................................33

*Carvel Corp. v. Noonan*,
3 N.Y.3d, 182 (2004) ................................................................................... 55, 56

*Cauble v. Mabon Nugent & Co.*,
594 F. Supp. 985 (S.D.N.Y. 1984) ............................................................... 28-29

*Conway v. Icahn & Co., Inc*,
16 F.3d 504 (2d Cir. 1994) ........................................................... 23, 28, 29, 43

*De Kwiatkowski v. Bear Stearns*,
126 F. Supp. 2d 672, 694 (S.D.N.Y. 2000), *rev'd on other grounds*,
*De Kwiatkowski v. Bear Stearns,* 306 F.3d 1293 (2d Cir. 2002) ................. *passim*

*Eva Rioseco and Nilda Cruz v. Gamco Asset Management, Inc.*,
2011 N.Y. Misc. LEXIS 7279 (N.Y. Sup. Ct. Sept. 23, 2011) ............... 30, 33, 34

*Fustok v. Conticommodity Servs., Inc.*,
618 F. Supp. 1082 (S.D.N.Y. 1985) ....................................................................28

*Global Enter. Group Holding, S.A. v. Ottimo*,
2020 U.S. Dist. LEXIS 145126 (E.D.N.Y. June 8, 2010) ............................ 46, 49

*Godelia v. Doe 1*,
881 F.3d 1309 (11th Cir. 2018) ..........................................................................19

*Goldman v. McMahan, Brafman, Morgan & Co.*,
No. 85-2236-Civ, 1987 U.S. Dist. LEXIS 5356 ,
1987 WL 12820  (S.D.N.Y. 1987)........................................................................49

*Greenfield v. Tassinari*,
8 A.D.3d 529 (N.Y. Sup. Ct. App. Div. 2004) ...................................................45

*Hydro Inv'rs, Inc. v. Trafalgar Power, Inc.*,
227 F.3d 8 (2d Cir. 2000) ...................................................................................41

*In re Blech Sec. Litig.*,
961 F. Supp. 569 (S.D.N.Y. 1997) ................................................................ 33, 49

*In re January 2021 Short Squeeze Trading Litig.* (Securities Tranche),
2022 U.S. Dist. LEXIS 143699 (S.D. FL Aug. 11, 2022 (Altonaga, J.) ....... 36, 44

*King County, Wash. v. IKB Deutsche Industriebank AG*,
863 F. Supp. 2d 288 (S.D.N.Y. 2012) .......................................................... 38, 39

*Kurtzman v. Bergstol*,
835 N.Y.S. 2d 644 (2nd Dep't 2007)..................................................................43

*McCarthy v. Dun & Bradstreet Corp.*,
482 F.3d 184 (2d Cir. 2007) ...............................................................................24

*McDaniel v. Bear Stearns & Co., Inc.*,
196 F. Supp. 2d. 343 (S.D.N.Y. 2002) ...................................................... *passim*

*McLean v. Triboro Coach Corp.*,
302 N.Y. 49 (N.Y. 1950) .....................................................................................29

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*,
697 F. Supp. 1224 (D.D.C. 1988).......................................................................29

*N.Y.U. v. Cont'l Ins. Co.*,
87 N.Y.2d 308 (1995) .........................................................................................53

*Nallan v. Helmsley-Spear, Inc.*,
50 N.Y.2d 507 (N.Y. 1980) .................................................................................41

*Overstock.com, Inc. v. Goldman Sachs & Co.*,
231 Cal.App.4th 513 (2014) ...............................................................................45

*Rozsa v. May Davis Group, Inc.,*
187 F. Supp. 2d 123 (S.D.N.Y. 2002) ............................................. 33, 34, 45, 46

*Scone Investments, L.P. v. American Third Market Corp.*, No. 97 Civ.,
   3802 (SAS) 1998 WL 205338 (S.D.N.Y. Apr. 28, 1998) ...................................46

*Scott v. Dime Sav. Bank of New York, F.S.B.*,
   886 F. Supp. 1073 (S.D.N.Y. 1995) ........................................................... 28, 30

*Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   465 F. Supp. 1233 (S.D.N.Y. 1979) .................................................................30

*Solomon v. City of New York*,
   66 N.Y.2d 1026 (N.Y. 1985) ...........................................................................23

*Spinelli v. NFL*,
   903 F.3d 185 (2d Cir. 2018) ............................................................................54

*Valentini v. Citigroup, Inc.*,
   837 F. Supp. 2d 304 (S.D.N.Y. 2011) .............................................................42

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*,
   803 F.2d 454 (9th Cir. 1986) ...........................................................................28

## Statutes & Other Authorities:

28 U.S.C. § 1291 ...................................................................................................1

28 U.S.C. § 1332(d)(2) ..........................................................................................1

17 C.F.R. § 240.15c3-1(a) ...................................................................................10

Fed. R. Civ. P. 12(b)(6) ................................................................................... 1, 19

FINRA Regulatory Notice 21-12 ..................................................... 10, 11, 24, 25

FINRA Regulatory Notice 21-16 .........................................................................53

Gerald B. Cline and Raymond L. Moss, Liability of Clearing Firms: Traditional
   and Developing Perspectives, 1062 *PLI/Corp.* 139 (1998) ...............................31

Henry F. Minnerop, The Role and Regulation of Clearing Brokers,
   48 *Bus. Law.* 841 (1993) ...................................................................................31

Restatement (Second) of Torts § 4c ....................................................................53

## STATEMENT OF JURISDICTION

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §1332(d)(2) because this is a putative class action with aggregate proposed class claims exceeding $5 million and more than 100 putative class members. Many members of the proposed class are citizens of a state different from Defendant.

On January 9, 2023, the United States District Court for the Southern District of Florida dismissed the Complaint with prejudice under Fed. R. Civ. P. 12(b)(6). Appellants timely filed a Notice of Appeal on February 6, 2023. This Court has jurisdiction pursuant to 28 U.S.C. §1291 because this is an appeal from the final judgment.

## STATEMENT OF ISSUES

1. Whether, in light of Defendant's failure to maintain appropriate safeguards against market volatility, Defendant's unilateral and virtually unprecedented prohibition of the purchase of specific stocks by its customers is actionable in tort when the stoppage was done admittedly to protect Defendant's own interests and caused injury to Plaintiffs and putative class members?

2. Whether Defendant, having stepped out of its ministerial role as a clearing broker and taking an active and direct role in the conduct at

issue, became liable for the injury it caused to Plaintiffs and putative class members resulting from its self-serving harmful conduct?

## **<u>INTRODUCTION</u>**

Before January 28, 2021, no securities broker-dealer in the United States had ever unilaterally halted the ability of all of its customers to purchase shares of common stock (and related options) which were highly liquid and in high demand for a period of hours with the intent to drive down the price of those securities for the broker's own advantage. On January 28, 2021, that unprecedented phenomena happened twice – first, instigated by the well-known trading powerhouse Robinhood (whose conduct is the subject of separate appeals before this Court) and second, engineered by the securities behemoth Apex Clearing Corporation ("Apex") – a securities broker-dealer and a securities clearing broker-dealer, the Defendant herein.

On January 28, 2021, Apex imposed a one-sided market suspension prohibiting its customers from purchasing three so-called "meme stocks", Gamestop Corp. ("GME"), AMC Theatres ("AMC") and Koss Corporation ("Koss") (together "The Suspended Stocks"), while permitting its customers to sell these same stocks as their market price plummeted as a direct result of the one-sided trading halt (the "Market Suspension").

Why did Apex impose the unprecedented Market Suspension? On the morning of January 28, 2021, Apex learned from the regulatory securities clearinghouse[1] that it would have to lodge significant collateral with the clearinghouse because of market volatility. Apex should not have been surprised by this information as Apex is in the business of assessing market volatility and, by regulation, has the tools and ability to anticipate its collateral requirements. In fact, all other securities broker dealers other than Apex and Robinhood were prepared to adequately address the market volatility. Plaintiffs allege that Apex was negligently unprepared to address market volatility that it was obligated to be prepared for and which virtually every other securities broker-dealer had been adequately prepared to address.

Apex, having been notified in writing by the regulators on January 28, 2021, regarding a large increased collateral contribution due that day, failed to confirm with the regulators whether they needed to increase their collateral contribution prior to imposing the Market Suspension. In fact, as Apex learned shortly after receiving the regulator's notice, Apex would indeed **not** be required to make a significant increased collateral deposit. Nevertheless, and despite receiving confirmation that no large collateral deposit was required, Apex negligently persisted in maintaining the Market Suspension for more than three additional hours. This meant that there

---

[1] See fn 4, *Infra.*

was no business reason that could even plausibly explain maintaining the Market Suspension for hours. If Apex was faced with the possibility of making a large collateral deposit, Apex had many options to handle the situation. By its own admission, Apex did not face a capital crunch and had the money available for the deposit. Apex could also have turned to its corporate owner for capital or it could have sought outside financing. It pursued none of those reasonable options. Instead, Apex chose to impose its unprecedented Market Suspension.

By its own admission, the Market Suspension cut off each customer's ability to purchase the Suspended Stocks with the intent of driving down the price of those stocks. Apex believed that a lower price per share of the Suspended Stocks caused by their forced prohibition of their customers' purchases would result in a lower collateral contribution assessed on Apex. But the higher collateral contribution was not necessary in any event, and Apex had alternatives available if it did in fact need to make the increased collateral deposit. The one thing that the Market Suspension was guaranteed to do was to drive down the price of the Suspended Stocks. And down they went. By taking action intended to drive down the price of the Suspended Stocks that Apex, as a broker-dealer, had previously participated in the sale of to Plaintiffs (Apex's customers), Plaintiff stockholders and the classes they seek to represent were harmed and suffered damages.

In dismissing this action, the MDL Court failed to properly consider industry regulations and New York jurisprudence, which governs this matter, in finding that Apex had no duty to its customers and was free to act in any manner of its choosing at any time. The governing principles of the securities markets and New York law is not the chaos the MDL Court endorsed. Accordingly, this Court should reverse the MDL Court's ruling.

## STATEMENT OF THE CASE

## I. STATEMENT OF FACTS

### A. Background on Apex

#### 1. Apex Is a Stockbroker and a Clearing Broker

Apex is a securities broker-dealer that provides broker-dealer services directly to investors that buy and sell securities. ¶¶ 23, 25, 43.[2] Various investor customers have broker-dealer accounts with Apex to directly purchase and sell securities through Apex's securities trading platform.

Apex also serves as a Clearing Broker-Dealer. As a Clearing Broker-Dealer, Apex provides backroom and administrative or ministerial services to generally smaller correspondent Introducing Broker-Dealers, such as Webull Financial LLC ("Webull") and Ally Invest ("Ally"). ¶¶ 25-26, 28. "Generally, the clearing firm is responsible for maintaining records and mailing customer account

---

[2] References are to Paragraph numbers in the Operative Complaint. Dkt. 483.

5

documentation, as well as receiving, maintaining and delivering customers' securities and funds." See Dkt. 494 at n. 25.

Investors who open accounts with the Introducing Broker-Dealers serviced by Apex (such as Webull) simultaneously entered into agreements by which they also became customers of Apex, as the Clearing Broker-Dealer. In this way, Apex customers are in three-party agreements as "Shared Customers" of the Introducing Broker-Dealer and Apex, the Clearing Broker-Dealer. The Shared Customers enter their trading orders through their Introducing Broker-Dealer which are then processed through the Clearing Broker-Dealer. ¶¶ 1, 25. Thus, the Clearing Broker-Dealer holds the key to the gateway that is the securities market through which Plaintiffs' trading requests must pass. In this litigation, both named Plaintiffs are Shared Customers between an Introducing Broker-Dealer and Apex as clearing broker. ¶¶ 14,18. Apex services approximately one hundred Introducing Broker-Dealers. ¶1. Apex is sued herein for improperly shutting the gate unilaterally so as to prohibit all purchases of the Suspended Stocks.

### 2. Apex Is a Regulated Broker-Dealer, Not A Regulated Securities Clearinghouse

"To perform its clearing and settlement functions as a clearing broker, Apex is a member of National Securities Clearing Corporation ("NSCC") and The Depository Trust Company ("DTC"). NSCC and DTC are the two SEC-

registered clearing agencies in the U.S. that clear and settle transactions in equity and corporate debt securities." *See,* Dkt. 491-2 at p.5

Clearing Broker-Dealers such as Apex provide "back office" functions and execute stock trades for its Shared Customers. Dkt. 525 at 4.[3]  A regulated clearinghouse, such as the [NSCC], serves as the "central counterparty that clears cash transactions in the U.S. equities markets[.]" *id.* at 4 ; ¶ 32 (alteration added)).[4] As the MDL Court stated, "The NSCC presides over member clearing brokers, like Defendant.  *See id.* ¶ 31.  To protect the clearinghouse from defaults, members [such as Apex] post collateral for their customers' transactions. *See id.*  The NSCC collects these funds from members "at the start of each day and intraday in volatile markets" (*id.* ¶38 (alteration added)) "As alleged in the Complaint, NSCC member broker-dealers like Apex must meet the daily deposit (collateral) requirements (by 10 am) required by the DTCC to support their customer trades between the trade date and the

---

"Dkt. 525" refers to the MDL Court's Order In This Matter entered on January 9, 2023.

[4] " To manage risk to the markets and utilize the Depository Trust Clearing Corporation's (DTCC) Insurance Services, broker-dealers such as Apex become NSCC members. The DTCC keeps a record of the stocks owned through the clearing brokerage firms for NSCC members, including Apex, and establishes financial requirements for clearing brokerage firm members, which include deposit requirements designed to reduce risk to the DTCC." ¶ 31.

date the trades settle. Established industry-wide metrics that take market volatility into account help determine the clearinghouse's collateral requirements.[5] Apex has access to market information and is able to "monitor its ability to meet anticipated or actual DTCC deposit requirements in real time." ¶ 36. Accordingly, as Plaintiffs allege, Apex "was at all times fully aware of its obligations to maintain requisite capital levels, satisfy cash deposit and collateral requirements with the DTCC and NSCC, and the serious consequences of violating those obligations." ¶¶ 27, 34-35.

### 3. As a Securities Broker-Dealer and as a Clearing Broker-Dealer, Apex Is Subject to Industry Standards of Care

Apex, as a securities broker-dealer, clearing and otherwise, is part of the fabric of a highly regulated industry – the securities industry. Regulations that govern the securities industry exist for the protection of investors and the market. ¶ 44. The securities industry does not exist in a vacuum. FINRA, the Financial Industry Regulatory Authority, for example, is the non-governmental (quasi governmental)

---

[5] Plaintiffs allege that "the calculation and timing of these margin [or collateral] requirements are known to every member, including Apex," and Apex "knew or should have known of its anticipated DTCC deposit requirements." ¶¶ 38–39. "Volatility is a significant factor in determining how much collateral a member must post on any given day. (*See id*. ¶¶ 37–38). As one might expect, the more volatile a security is, the higher the collateral requirement. (*See id*.)" (Dkt. 525 at 4)."

authority which guides the conduct of registered broker-dealers. Apex, is a registered FINRA member. [6] ¶ 43. "FINRA regulations require broker-dealers to 'observe high standards of commercial honor and just and equitable principles of trade' when dealing with their customers.'" (¶ 44 (citation and quotation marks omitted)) (Dkt. 525 at 6). Interpretative material from the securities regulators states, "[i]mplicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing. Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of [FINRA's] Rules, with particular emphasis on the requirement to deal fairly with the public." ¶ 44.

Accordingly, FINRA members such as Apex are subject to "a duty of due care and loyalty" and must handle customer orders promptly and refrain from putting their own interests ahead of their customers' interests. ¶ 47. Moreover, broker-dealers owe their customers a duty to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility. FINRA members have a duty "to implement… risk assessment tools to

---

[6] Apex as a broker-dealer is also registered with and subject to the rules and regulations of the SEC ( ¶¶ 23, 43) and the National Securities Clearing Corporation ("NSCC"). ¶ 27.

manage potential operational and credit risks" (¶ 47 ) and must "engage in continual risk management of its trading and financial mission critical systems." *id*. ¶ 45.[7]

Consistent with its members' duties, FINRA reiterated in Regulatory Notice 21-12 in response to the events complained of herein that "the foundation of the securities industry is fair dealing with customers. . . ***even during times of market stress***." (emphasis added). ¶ 44.

Because the securities industry is so highly regulated, there are established industry procedures for dealing with extraordinary volatility. Those procedures permit for a securities exchange to implement a temporary and full trading halt meaning that no broker-dealer that is a member of the relevant exchange is allowed to either sell or purchase the designated securities for which trading is halted. The securities industry has not approved of any mechanism by which any one particular broker-dealer is permitted to unilaterally halt one side of the trading equation, as Apex did, the transgression which gave rise to this lawsuit. ¶¶ 52-56.

---

[7] Among the regulations that Apex must adhere to are the Net Capital Rule - an "SEC regulation that "requires broker-dealers to 'at all times have and maintain net capital' no less than the greatest of the minimum requirement applicable to its business." *Id*. ¶ 40  (quoting 17 C.F.R. § 240.15c3-1(a)).  This rule ensures that even in times of volatility, like during a short squeeze, broker-dealers have 'sufficient liquid assets to meet all obligations to customers.'" (*Id*.). Dkt. 525 at 5-6.

Instead, securities regulations provide, as FINRA reiterated in response to the events complained of here, that "[m]ember firms [such as Apex] should maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility, as in the past several months." ¶ 51. These include "liquidity management practices to ensure the firm is able to continue to provide customers with access to the markets despite abnormal liquidity demands." *See* FINRA Regulatory Notice 21-12, *available at* https://www.finra.org/rules-guidance/notices/21-12. ¶ 51.

### B. The Relevant Market Events of January 2021

Contemporary press reports in January 2021 reported on a "short squeeze" involving certain so-called "meme" stocks resulting from the reported confluence of social media-driven retail purchasing supposedly driving institutional hedge funds to cover short positions in those same stocks. The initial complaints filed in January 2021 alleged as much and this MDL which resulted, adopted "short squeeze" into the name of the litigation. Three stocks relevant here, the Suspended Stocks, Gamestop, AMC Theatres and Koss Corporation, were actively traded and experienced precipitous price increases between January 21 and January 27, 2021. ¶¶ 60, 65.

Upon further review and given the benefit of the passage of time, the SEC staff concluded in its later filed report commenting on the events that gave rise to this lawsuit that the SEC staff could not endorse the position that a "short squeeze" had occurred in January 2021 nor could the SEC staff endorse the view that market volatility was extraordinary in January 2021. Plaintiffs' Operative Complaint acknowledged the SEC staff's conclusion that "it was the positive sentiment, not the buying-to-cover, that sustained the weeks-long price appreciation of GameStop stock." ¶ 67 citing SEC Staff Report at 26. [8]

Recognizing that market volatility is a frequent occurrence as are short squeezes, ¶ 58, the SEC staff reported:

> Yet while the swings in GME's share price and volume attracted significant attention, they were not unusual for January 2021. For instance, single- day price changes on January 27 from the closing prices on January 26 for KOSS (480.0%), AMC (301.2%), NAKD (252.3%), and Express, Inc. (symbol: EXPR) (214.1%) were larger than any single-day GME price change… In fact, since 2020 began, 134 common stocks had at least one one-day price increase greater than GME's largest one-day price increase…(internal citations omitted). ¶ 66.

Although the SEC Staff Report reported on the frequency of market volatility and the unexceptional trading in January 2021, the MDL Court ignored both the SEC Staff Report and the pleadings in erroneously making a dipositive finding of fact on

---

[8] While the SEC staff focused on trading in Gamestop among the various meme stocks, nothing in the report suggests that the SEC had a different view regarding the trading in any of the other meme stocks.

a pleading motion, one ultimately discounted by the SEC staff view, that an extraordinary short squeeze had roiled the markets in January 2021. Dkt. 525 at 2. In addition, the MDL Court ignored the well pleaded facts that, except for Robinhood and Apex, other broker-dealers handled the market events of January 2021 appropriately and did not implement the unprecedented, extraordinary, prolonged and harmful one-way Market Suspension undertaken by Apex, that was certain to harm Plaintiffs and other investors in the proposed Classes. ¶¶ 92-94.

### C. Apex Locks The Gate With Its One-Way Market Suspension

On January 28, 2021, Apex unilaterally blocked its direct customers and required all of its Introducing Broker-Dealers to block their Shared Customers from purchasing the common stock of and call options in the Suspended Stocks, which were highly liquid and much in-demand, for a period of approximately three and one-half hours. ¶¶ 2, 29, 70.

Plaintiffs allege that Apex's "decision to implement this unilateral one-way Market Suspension (halting of the buying, but not the selling) was designed to and foreseeably did impede additional price appreciation and suppressed the prices of the Suspended Stocks during and beyond the Class Period causing ascertainable damages and injury." ¶ 70. By its own admission, Apex undertook this virtually

unprecedented action,[9] designed to drive down the prices of certain securities,[10] based simply on the chance of a possible increased future collateral NSCC requirement that Apex had taken no steps to confirm before implementation of the Market Suspension. ¶¶ 80-83.

Even more striking, Apex kept this one-way shut down, or Market Suspension, in place for approximately three hours *after* it received notice and confirmed with the regulators that the actual NSCC collateralization number was, in fact, lower and at a level that Apex believed did not warrant a one-way trading shut down at all. ¶¶ 4,77-84. And, as Apex admitted, the "NSCC did not collect or demand additional collateral from Apex intraday" on January 28, 2021. ¶ 85.

---

[9] To Plaintiffs' and Plaintiffs' counsels' knowledge, other than Apex and Robinhood, no other broker-dealer has ever engaged in the prolonged one-way Market Suspension of liquid highly in-demand stocks.

[10] Apex concedes that if the trading price of AMC, GME and/or KOSS went up, Apex perceived a risk to its ability to meet a potential increased collateral funding obligation. *See* Dkt. 491-2 at p. 7 and Dkt. 494 at fn 31 ("Apex took these steps to manage the risk that it would not be able to meet potential increased NSCC collateral funding obligations if Apex clients were permitted to continue to engage in additional purchases of AMC, GME and KOSS - thereby potentially further increasing Apex's clearing deposit requirement to NSCC. NSCC intraday margin increase as of 10:00 a.m. ET on AMC and GME alone went from 25% and 0% of market value to 118% and 78.3% of market value, respectively. Meaning that for every $1.00 of AMC purchased by an end customer, Apex was required to deposit $1.18 with NSCC.").

Nor was Apex ever in danger on January 28, 2021, of failing to meet any possible increased collateral requirement absent the Market Suspension. ¶ 86. When asked to comment on whether Apex faced a capital crunch on January 28, 2021, its former president stated, as reported in a printed publication, "[w]e have headroom in terms of the capital available to us on our balance sheet. We have lines of credit that we can call on as needed." ¶ 87. Clearly, Apex's Market Suspension was unwarranted.

Apex's Introducing Brokers disagreed with Apex's decision to halt purchases of the Suspended Stocks with one such Introducing Broker notifying customers that "[w]e disagree with this decision and are working hard for our members to resolve the issue." ¶ 75. Apex's customers protested Apex's decision with one customer calling the decision "unacceptable and unnecessary." ¶ 76. Apex, which knew that its one-sided Market Suspension was considered unacceptable by its customers and Introducing Broker-Dealers, determined to not repeat such conduct and understood that in order to meet any capital requirement it needed to raise capital and not harm its customers. ¶ 90. Accordingly, Apex, to date, has not repeated its one-sided shutdown of liquid highly in-demand securities purchases, nor has any broker-dealer other than Robinhood undertaken a one-sided Market Suspension of liquid in-demand securities. ¶ 92. In essence, on January 28, 2021, Apex stepped out of its

ministerial role of a clearing broker and instead actively injured its customers in order to prevent the possibility that it would be required to post additional collateral.

Predictably, Apex's unprecedented o n e - s i d e d Market Suspension adversely affected the market prices for shares of the Suspended Stocks. Apex knew of investor demand for those stocks and that such demand was causing the prices of those stocks to increase. ¶¶ 58-68. Apex's Market Suspension caused the prices of the Suspended Stocks – Gamestop, AMC and Koss "to go down and to trade at lower prices than they would have traded for absent Apex's misconduct." ¶ 68. Not only did the unprecedented unilateral Market Suspension cause the price of the Suspended Stocks to go down, i t "foreseeably impeded additional price appreciation and suppressed the prices of the Suspended Stocks during and beyond the Class Period causing ascertainable damages and injury." ¶¶ 68, 70.

## II. COURSE OF PROCEEDINGS BELOW

Numerous lawsuits were filed challenging Robinhood's one-sided Market Suspension of January 28, 2021. Those suits were consolidated into the MDL styled, *In re January 2021 Short Squeeze Trading Litigation*, currently pending in the United States District Court for Southern District of Florida. The MDL Judge divided the matter into four tranches to proceed separately: (i) Robinhood state law claims; (ii) Robinhood federal securities law claims; (iii) Robinhood antitrust law claims; and, (iv) state law claims against other brokers that had acted similarly to

Robinhood. This last tranche has been referred to as "The Other Broker Tranche" and this appeal arises from the dismissal of the action brought in The Other Broker Tranche.

Although the MDL Court's Opinion dismissing this matter refers to Plaintiffs' Complaint as the Fourth Amended Complaint, the MDL Court only considered and ruled on the substantive issues once and dismissed with prejudice. Plaintiffs' Consolidated Class Action Complaint (Dkt. 359) was amended as of right following Defendants' Motion to Dismiss, but was never ruled upon. Plaintiffs' Amended Consolidated Class Action Complaint (Dkt. 410) was dismissed on jurisdictional grounds as the complaint was filed directly into the MDL's transferee forum (*e.g.*, S.D. Fla.), and was not originally filed into a transferring court with jurisdiction. (Dkt. 450) Plaintiffs then filed a Class Action Complaint in the Southern District of New York (Case Number 1:22-cv-01233). That complaint was transferred by the MDL Panel to the MDL Court, (Dkt. 475) and docketed into the MDL Court (Dkt. 479). The MDL Court then issued an Order directing Plaintiffs to file an amended complaint "clarifying their citizenship." (Dkt. 481). Plaintiffs' Amended Class Action Complaint (Dkt. 483) (the "Operative Complaint"), the only complaint to be substantively reviewed by the MDL Court in any published order was dismissed with prejudice (Dkt. 525).

Although Robinhood and Apex find themselves in the same MDL proceedings, different substantive state laws apply - New York law applies to Apex, while California and/or Florida law apply to Robinhood. Factually, Apex and Robinhood are situated differently, as each used different documents, behaved differently and there exists no evidence of, nor allegation of, collusion between the two firms in connection with the alleged misconduct. Accordingly, despite being in the same MDL proceedings, this case against Apex is a stand-alone action based on New York law that does not depend upon nor rely upon the facts or the law as applied in any case against Robinhood.

The Operative Complaint pleads four common law causes of action under state law: (1) negligence; (2) breach of fiduciary duty; (3) alternatively, breach of the implied covenant of good faith and fair dealing; and (4) alternatively, tortious interference.

Plaintiffs allege two subclasses of persons harmed by Apex's misconduct: (1) the "Nationwide Investor Class" of persons who (a) held the Suspended Stocks at the time of Apex's trading restrictions and (b) sold those securities between January 28, 2021 and February 23, 2021; and (2) the "Apex Broker-Dealer Class" of Apex's direct and Shared Customers whose trading (or attempted trading) in the Suspended Stocks was negatively affected by the trading restrictions on the Suspended Stocks. ¶98.

On January 9, 2023, the MDL Court, taking a first look at the substance of the complaint against Apex granted Apex's motion to dismiss with prejudice. Dkt. 525.

Plaintiffs appeal that dismissal.

## III. STANDARD OF REVIEW

A district court's dismissal under Rule 12(b)(6) is reviewed *de novo*, as are underlying questions of state law. *See Godelia v. Doe 1*, 881 F.3d 1309, 1316 (11th Cir. 2018).

## SUMMARY OF ARGUMENT

New York law controls this action.

Apex, as a direct broker-dealer and a clearing broker-dealer, owes duties and fiduciary duties to its customers, including a duty not to place its own financial self-interest over its customers' interests to the financial detriment of the customers.

The MDL Court erroneously allowed Apex to avoid tort liability for its imposition of the one-way Market Suspension designed to lower the prices of securities it had participated in the sale to Plaintiffs. First, the lower court held that Apex could not, as a matter of law, face negligence claims for its failure to properly prepare for a potential large increase in collateral requirements on January 28, 2021, although industry regulations mandate that broker-dealers such as Apex be adequately prepared for such possibility and all but one other broker-dealer was

adequately prepared.  In addition, the MDL Court erroneously immunized Apex from negligence liability, despite that Apex waited approximately three hours to lift the harmful and unprecedented one-way Market Suspension after Apex learned and confirmed with regulators that no such large increased collateral was required.  Apex knew approximately three hours before lifting the Market Suspension that there was no business purpose for having ever imposed it in the first place.

In finding that no plausible negligence claim could be leveled against Apex, the MDL Court erroneously concluded that Apex, as a broker-dealer, owed no duty to its investor clients despite industry (FINRA) regulations spelling out duties governing the conduct of broker-dealers,  and despite controlling and binding New York law establishing that a broker-dealer's failure to abide by industry standards of care is evidence of broker-dealer negligence.

The MDL Court committed further error in absolving Apex of liability in connection with its role as a Clearing Broker-Dealer.  While Clearing Broker-Dealers are generally not liable to customers of an Introducing Broker-Dealer for the ministerial tasks clearing brokers typically perform, such as back office administrative tasks, clearing brokers may be liable for negligence under New York law when they perform tasks beyond a ministerial role and are direct participants in the alleged misconduct.  Here, Plaintiffs allege that Apex acted beyond its ministerial role in directing the one-way Market Suspension complained

of over the objection of the introducing brokers.  The MDL Court agreed that Apex had done just that but committed reversible error in essentially creating a *per se* exclusion from liability for clearing broker-dealers.  New York law does not recognize such *per se* exclusions for clearing broker-dealers.

The MDL Court also excused Apex based upon a misunderstanding of the Economic Loss Doctrine under New York law.  The MDL Court incorrectly held that a clearing broker can only be held accountable for negligence if it is a fiduciary and that a clearing broker cannot be held liable for breach of fiduciary duty absent allegations that the clearing broker-dealer committed fraud.   There is no requirement under New York law that a clearing broker be a fiduciary to be held liable for negligence.  Further, no New York court has ever imposed a fraud requirement under New York law as a predicate for clearing broker liability.  Instead, New York law provides that Clearing Broker-Dealers such as Apex may be liable for negligence upon a showing of the Clearing Broker-Dealer's direct involvement in the misdeed alleged.

Moreover, Apex is alternatively liable under New York law for breaching the implied covenant of good faith and fair dealing, as well as under the implied duty of care.  Lastly, the MDL Court erred in dismissing the alternative tortious-interference claim based on the assumption that no breach of the implied covenants occurred.

**ARGUMENT**

## I.    PLAINTIFFS STATE A VIABLE CLAIM FOR NEGLIGENCE UNDER NEW YORK LAW

As the MDL Court held, New York law governs this action.  Dkt. 525 at 17.

Plaintiffs allege that Apex was negligent because it was not properly prepared to address market volatility on January 28, 2021, with regard to its regulatory requirements, and, that it was negligent in addressing the communications from regulators on January 28th by implementing the injurious one-way Market Suspension for nearly three and one-half hours when it did not need to.  Apex was further negligent in continuing the Market Suspension for hours after regulators informed Apex that the increased collateral deposit that prompted the Market Suspension to begin with was not required. Dkt. 494 at 32-33.

 Confronted with its negligent unpreparedness to address market volatility on January 28, 2021, Apex could have taken steps to address the volatility without deliberately causing harm to its customers and the putative Class.  For example, Apex claims that it did not have a cash crunch, so it simply could have used its own funds or funds from its parent corporation, or even raised funds if it needed to meet any potential collateral increase.  It did not do any of those things.  Instead, Apex was unprepared and refused to use any reasonable means to address the situation at hand, instead taking unprecedented unilateral action deliberately designed to drive

down the price of the Suspended Stocks sold to Plaintiffs with consequential damages to Plaintiffs and the putative Class.

As the MDL Court held, "[t]o establish a prima facie case of negligence" under New York law, "a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (N.Y. 1985) (citations omitted). D k t .  5 2 5  a t  2 5 - 2 6 .

The MDL Court found, however, that Defendant owed no duty to Plaintiffs under New York law and concluded that "[t]he first element [duty] proves insurmountable to Plaintiffs." *Id.*

This holding is in error.

### A. Apex As a Broker-Dealer Owed Plaintiffs Duties of Care Commensurate With Those of Other Professionals

The customers/investors (Plaintiffs) and the broker-dealer (and clearing broker-dealer) relationship is rooted in traditional agency law (principal-agent). *Conway v. Icahn & Co., Inc*, 16 F.3d 504, 510 (2d Cir. 1994) ("the relationship between a stockbroker and its customer is that of principal and agent and is fiduciary in nature, according to New York law") (internal cites omitted).  Under the MDL Court's reasoning, in the absence of the broker-dealer making investment decisions for the investor, the agent broker-dealer (and clearing broker-dealer) is free to undertake acts in connection with its role as agent by putting its own self-interest

before that of the interest of the principal – the investor. New York law permits no such chaos. The foundation of the regulatory scheme encompassed in the rules governing the conduct and performance of broker-dealers prohibit broker-dealers from engaging in the type of action undertaken here by Defendant. That is, action specifically designed and certain to harm the customer financially for the benefit of the broker-dealer's own self-interest. As Plaintiffs have previously argued, New York courts recognize the failure of broker-dealers to abide by industry regulations as a predicate for civil liability. Dkt. 494 at 36. The MDL Court's opinion essentially wipes out any notion of investor protection even where the broker-dealer's actions are contrary to the customer's interest. This ruling is counter to the investor protection scheme that Defendant is obligated to abide by as a member of FINRA and runs afoul of New York law.

In holding that broker-dealers owe no duty to investors, the MDL Court ignored relevant parts of the Complaint and controlling legal authority. The MDL Court was obligated to accept as true all factual statements alleged in the Operative Complaint "and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

For example, Plaintiffs pled and argued below that FINRA had reiterated in Regulatory Notice 21-12, issued in response to the events complained of here that

"the foundation of the securities industry is fair dealing with customers. . . *even during times of market stress*." (emphasis added). ¶ 44.

Moreover, the MDL Court ignored the FINRA requirement for "broker-dealers to effectively manage their liquidity during extreme market conditions" such that "[m]ember firms should maintain strong procedures, thoughtfully crafted in advance, to reasonably ensure that they can continue to provide investors access to the securities markets during times of extreme market volatility, as in the past several months." These include "liquidity management practices to ensure the firm is able to continue to provide customers with access to the markets despite abnormal liquidity demands." *See* FINRA Regulatory Notice 21-12, *available at* https://www.finra.org/rules-guidance/notices/21-12. ¶ 51. Access to the securities market means an investor maintains the ability to both buy and sell the securities at issue.

The MDL Court ignored these core industry requirements, and focused instead on other more general duties in dismissing the Operative Complaint. Dkt. 525 at 26.

The fact that Apex is alleged to have negligently failed to employ liquidity management practices to ensure that the firm was able to continue to provide customers with access to the markets on January 28, 2021, sufficiently states a cause of action. The fact that Apex is alleged to have dealt unfairly with its

customers in putting its own financial interest ahead of its customers' financial interest sufficiently states a cause of action. These are not idle duties, but duties undertaken by Apex as a FINRA member in connection with its broader duties to "observe high standards of commercial honor and just and equitable principles of trade when dealing with [its] customers." ¶ 44.

A jury may ultimately conclude that Apex did act fairly and reasonably on January 28, 2021 – but that is not a question to be decided at the pleading stage of the litigation. The sole question to be decided in considering whether to dismiss the Complaint is whether Plaintiffs have properly asserted a cause of action for negligence – and more precisely here as a predicate, whether Plaintiffs properly asserted that Defendant owed Plaintiffs a duty as prescribed by industry regulations and New York law. The answer to that question is yes. The investor/broker-dealer relationship does not exist in a vacuum.

The language that the MDL Court used in finding Apex had no such duty supports the reversal of its finding. The MDL Court erroneously concluded, "New York law provides scant basis for these supposed duties." Dkt. 525 at 26.

There are two errors in this conclusion. First, there are no "supposed" duties – either there are duties or there are no duties. Here, there are duties as Apex itself recognizes through its membership in FINRA which imposes duties of conduct on broker-dealers, which, as indicated, provides a basis for liability in negligence.

Second, finding a "scant" basis for the finding of a duty means that the MDL Court found some basis. If New York law provides some basis for the finding of liability – scant or otherwise – then the pleadings assert a cause of action. And because the pleadings do so, dismissal of this action was improper.

The MDL Court revisited its duty analysis later in its Opinion. In the latter part of the Opinion the MDL Court held that Plaintiffs' duty allegations "run contrary to New York law" Dkt. 525 at 31. In particular, the MDL Court rejected Plaintiffs' allegations that:

> Defendant has duties to "ensure that the trading platforms it provide[s] and/or support[s are] sufficiently equipped to reliably deliver such services under reasonably foreseeable increasing customer demands and resulting market conditions at issue in this case" (Am. CAC ¶ 107 (alterations added)), and to "exercise reasonable care in safeguarding the investments of Plaintiffs and Class members by providing a platform and/or supporting a platform to execute trades that is fair and promptly provides execution of customers [sic] trade orders in a lawful manner" (*id*. ¶ 108).
>
> *Id.*

The MDL Court, however, even in the latter part of its Opinion continued to misperceive Plaintiffs' core allegations of Defendant's duty. Namely, the duty to "observe high standards of commercial honor and just and equitable principles of trade when dealing with [its] customers" ¶ 44. This duty ensures that a broker-dealer does not act in its own financial interests to the financial detriment of the customer, as Apex did here by instituting a one-way Market Suspension certain to drive down the prices of the Suspended Stocks.

27

Respectfully, it was error for the MDL Court to hold that the industry-wide duties of conduct that Plaintiffs have pled and argued do not exist. These are industry-wide duties by which Apex, as a member of FINRA, must abide. The proper inquiry is whether Apex failed to abide by the duties owed its customers that it had agreed to undertake in its role as a broker-dealer. Under New York law, as demonstrated below, Apex's failure to abide by industry standards of care is actionable evidence of its negligence.

### B. New York Courts Have Recognized That Broker-Dealers Owe a Duty to Customers and May Be Held Liable for Negligence Under New York Law

The Second Circuit has firmly held that under New York law a duty of care arises by virtue of the broker-client relationship itself, irrespective of whether the broker-dealer provides investment advice or controls a client's discretionary account(s). In *de Kwiatkowski v. Bear, Stearns & Co.,* 306 F.3d 1293, 1305 (2d Cir. 2002), the Second Circuit stated, "No doubt, a duty of reasonable care applies to the broker's performance of its obligations to customers with nondiscretionary accounts." The Second Circuit cited numerous cases in support of that proposition.[11]

---

[11] *See, e.g.*, *Conway v. Icahn & Co., Inc.*, 16 F.3d 504, 510 (2d Cir. 1994); *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 803 F.2d 454, 460-61 (9th Cir. 1986); *Scott v. Dime Sav. Bank of New York, F.S.B.*, 886 F. Supp. 1073, 1080-81 (S.D.N.Y. 1995); *Fustok v. Conticommodity Servs., Inc.*, 618 F. Supp. 1082, 1085-86 (S.D.N.Y. 1985); *Cauble v. Mabon Nugent & Co.*, 594 F. Supp. 985, 992

This standard of care is recognized to be a duty to act in accordance with the standard of care used by other professionals in the community which includes the duty to act in the best interests of the client and not put its own financial interests first to the detriment of the client. *Conway v. Icahn & Co., Inc.* 16 F.3d at 510 (2d Cir. 1994).

However, the MDL Court agreed with Plaintiffs that broker-dealers typically owe duties to their customers. To that end the MDL Court held:

> A negligence theory holds defendants liable for their "failure to employ reasonable care — the care which the law's reasonably prudent man should use under the circumstances of a particular case." *McLean v. Triboro Coach Corp.*, 302 N.Y. 49, 51 (N.Y. 1950). **In many cases, New York law imposes a duty of reasonable care on broker-dealers**. *See de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1305 (2d Cir. 2002) (collecting cases).

Dkt. 525 at 31. (emphasis added).

The MDL Court, in considering Plaintiffs' allegations, improperly downplayed the industry requirements placed on broker-dealers and then incorrectly concluded that a broker-dealer's violation of industry standards as a general proposition could not be a predicate for negligence liability. *Id.* at 32. New York law holds otherwise and the MDL Court's holding is in error.

---

(S.D.N.Y. 1984); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F. Supp. 1224, 1227 (D.D.C. 1988). *de Kwiatkowski*, 306 F.3d, at 1305-1306.

Courts applying New York law have held that when violations of securities industry standards are pled, that constitutes evidence which supports a negligence claim.

For example, in *Eva Rioseco and Nilda Cruz v. Gamco Asset Management, Inc.,* 2011 N.Y. Misc. LEXIS 7279 at *79-*80 (N.Y. Sup. Ct. Sept. 23, 2011), the court held that while it was true that a violation of industry standards did not, in itself, give rise to a private cause of action, the violation of industry standards can be evidence considered in support of a private claim for tort liability. Similarly, in *Scott v. Dime Sav. Bank of New York, FSB*, 886 F. Supp. 1073, 1080-81 (S.D.N.Y. 1995), the court concluded in accordance with well-established New York precedent that violations of industry rules and practices give rise to common law claims of negligence. *See also, Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 465 F. Supp. 1233, 1236 (S.D.N.Y. 1979) (violation of New York Stock Exchange rules can be remedied by state common law actions for negligence).

### C. Apex Does Not Escape Liability Because It Is A Clearing Broker-Dealer

The MDL Court committed error in wrongly holding that Clearing Broker-Dealers owe no duties to customers they share with Introducing Brokers.[12] That is

---

[12] The MDL Court held: "The distinction [as between broker-dealers and clearing broker dealers] is crucial, for 'clearing brokers' simply 'do not owe duties to plaintiffs who are customers of their introducing brokers.' *Rozsa*, 187 F. Supp. 2d at 131 (citations omitted); *see also Glob. Enter. Grp. Holding, S.A.*, 2010 WL 11629556, at *4 (observing that 'a clearing broker owes no duty to individual

not the law.  Negligence liability may attach to Clearing Broker-Dealers that perform tasks beyond mere ministerial clearing functions[13] and directly participate in the alleged wrongdoing.

Here, Plaintiffs make no allegations challenging any ministerial task performed by Apex.  Plaintiffs complain that Apex not only improperly prevented its direct broker customers from purchasing the Suspended Stocks to the detriment of its direct customers, but also improperly directed its Introducing Brokers to not allow the customers that the Introducing Brokers and Apex shared, such as Plaintiffs, to purchase the Suspended Stocks to the detriment of Plaintiffs and others similarly situated.  The MDL Court apparently did not consider that here the customers of the

---

investors' (citations omitted)).  That fact suffices to stop Count I [negligence] in its tracks."  Dkt. 525 at 31.

[13] Plaintiffs set forth below the ministerial tasks that Clearing Broker-Dealers typically perform:

> In a typical clearing arrangement, a clearing firm provides many backroom and administrative functions for another broker-dealer's customer accounts. *See* Gerald B. Cline and Raymond L. Moss, Liability of Clearing Firms: Traditional and Developing Perspectives, 1062 *PLI/Corp.* 139, 143 (1998).  Generally, the clearing firm is responsible for maintaining records and mailing customer account documentation, as well as receiving, maintaining and delivering customers' securities and funds. *See id.;* Henry F. Minnerop, The Role and Regulation of Clearing Brokers, 48 *Bus. Law.* 841  841 (1993).  *McDaniel v. Bear Stearns & Co., Inc.,* 196 F. Supp. 2d. 343, 347 (S.D.N.Y. 2002).

Dkt. 494 at fn 25.

Introducing Brokers are also Shared Customers of Apex as a Clearing Broker. That fact scenario was apparently different in the cases that the MDL Court relied on. (*See* fn. 12).

Because Apex controlled the clearing functions – the most important aspect of this being the actual execution of the trades and the funding that goes along with the execution – Apex had the power to shut down trading by the Introducing Broker-Dealers and in fact did just that to the detriment of the Shared Customers and over the objection of the Introducing Broker-Dealers. There has never been a case like this before or since, as no other clearing broker has ever unilaterally directed a systemwide one-way market shut down forcing approximately 100 Introducing Broker-Dealers to suspend the purchase of highly liquid, in-demand stocks for its own financial benefit and to the detriment of its customers – shared or otherwise.

Here, the MDL Court erroneously immunized Apex as a Clearing Broker-Dealer for conduct that goes beyond the role of a clearing broker. Contrary to the MDL Court's observation[14], Plaintiffs have cited numerous cases holding clearing brokers liable for conduct that, like that of Apex, goes beyond typical ministerial

---

[14] Dkt. 525 at 32.

clearing firm activity, such that the clearing firm is a direct participant in the misconduct alleged. *See, McDaniel v. Bear Stearns & Co., Inc.,* 196 F. Supp. 2d. 343, 347 (S.D.N.Y. 2002). *See also, Berwecky v. Bear Stearns & Co.,* 197 F.R.D. 65 (S.D.N.Y. 2000) (complaint against clearing broker, Bear Stearns, viable where allegation is that Bear Stearns "shed [its] role as a mere clearing broker for and with actual knowledge, directly participated in described scheme."); *In re Blech Sec. Litig.,* 961 F. Supp. 569, 585 (S.D.N.Y. 1997) (complaint against clearing firm viable where plaintiffs alleged that Bear engaged in activities that did not "reflect ... the standard practice of [a] clearing broker."); *Cannizaro v Bache, Halsey, Stuart, Shields, Inc.,* 81 F.R.D. 719, 721 (S.D.N.Y. 1979) (denying motion to dismiss aiding and abetting claim against clearing firm where facts might show that clearing firm performed more than mere mechanical functions for introducing broker).

The MDL Court, however, relies on a footnote in the *Rioseco* case (footnote 22) citing to the *Rosza* case for the proposition that clearing brokers owe no duties to customers (presumably of introducing brokers). Dkt. 525 at 32-33.

This ruling by the MDL Court misinterprets both the *Rioseco* footnote and the holding in *Rosza*. The relevant portion of footnote 22 in *Rioseco* reads as follows: "in *Rozsa...* the court found that a clearing broker had no fiduciary duties owed. Because a clearing broker's duties are very different from an investment advisor's

duties, *Rozsa* has no bearing on whether Plaintiffs have adequately alleged a breach of fiduciary duty cause of action." *Rioseco*, 2011 N.Y. Misc. LEXIS 7279 at \*79 fn. 22 (N.Y. Sup. Ct. Sept. 23, 2011).  But Plaintiffs have asserted that broker-dealers (always) and clearing broker-dealers (under the limited circumstances present here) have both duties of care and fiduciary duties to their clients.  The footnote in *Rioseco* that the MDL Court relies upon only speaks to "fiduciary duties" and is silent as to non-fiduciary duties of care.  It was error for the MDL Court to rely on this footnote as to alleged duties of care which are not addressed by the *Rioseco* footnote.

Moreover, and importantly, the *Rosza* case only notes that Clearing Broker-Dealers owe no fiduciary duties to the customers of introducing brokers when they perform "generic" clearing functions.  *Rozsa v. May Davis Group, Inc., 187 F. Supp. 2d*, 123, 129 (S.D.N.Y. 2002).  Here, as previously stated, the customers are shared between the Introducing Broker-Dealers and the Clearing Broker-Dealer.  The Plaintiffs are customers of Apex – not merely customers of the Introducing Broker-Dealers as in *Rosza.*  Plaintiffs do not allege liability for "generic" clearing functions, but instead allege liability for directing the particularized misdeeds that caused harm.  Dkt. 494 at 46-50.  The question before the MDL Court was whether Plaintiffs had sufficiently alleged that Apex had taken actions that went beyond those of a generic

Clearing Broker-Dealer and had engineered the misdeeds alleged. Plaintiffs properly alleged liability by Apex in its role as a Clearing Broker-Dealer.

As further described below, the MDL Court committed additional error by making it a requirement that for a Clearing Broker-Dealer to be held liable for the breach of fiduciary duty, the Clearing Broker-Dealer must be alleged to have committed fraud. New York law imposes no such fraud requirement to Clearing Broker-Dealer liability and it was improper for this Court to create a substantive barrier to liability that no New York Court has ever imposed. To be clear, in the ordinary course of securities trading, clearing brokers escape liability for actions committed by introducing brokers. That is the law and it is common sense. To the extent that a clearing broker only acts incidentally to the transaction in a totally ministerial manner then the clearing broker has not acted improperly. That is not what took place here, nor is it what the Complaint alleged.

### D. The "Economic Loss Doctrine" Is Not a Bar to Plaintiffs' Recovery Under New York Law

The MDL Court, in considering the "Economic Loss Doctrine" concluded that under New York law, based upon its reading of *AMBAC Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 159 (S.D.N.Y. 2018), a defendant cannot be held "liable in tort for purely economic loss unless the plaintiff demonstrates that the defendant owed a duty, which may arise from a special relationship, to protect

against the risk of harm to plaintiff." Dkt. 525 at 26. The conclusions that the MDL Court has drawn from *AMBAC* are incorrect.

The MDL Court in its Order, citing to *AMBAC* noted, "[t]o begin, New York tort law imposes no general duty to protect against purely economic losses. In fact, the economic loss doctrine suggests the opposite is true." *Id.* at 26. But, Plaintiffs never argued for the existence of a "general duty to protect against purely economic loss." Instead, Plaintiffs pled and argued that broker-dealers had a duty to deal fairly and in good faith with their customers. ¶ 5, 44, 106, 110-12 ; Dkt. 494 at 16.

In fact, Defendant Apex itself has not argued that broker-dealers owe no duty to non-discretionary investor customers, but rather, that the broker-dealer duties of fair dealing to non-discretionary investors are limited in connection with the transaction at issue. (Dkt. 491 at 39, citing to *de Kwiatkowski*, 306 F.3d at 1311). Plaintiffs do not disagree with this proposition, but Plaintiffs have asserted that Apex's alleged misdeeds are in connection with the transaction(s) at issue. Dkt. 494 at 34. The MDL Court, despite stating an expansive view as to the definition of "transaction" in the related Robinhood federal securities case proceeding in this MDL, has improperly ignored this issue here. *See, In re January 2021 Short Squeeze Trading Litig.* (Securities Tranche), 2022 U.S. Dist. LEXIS 143699 at *44 (S.D. FL Aug. 11, 2022 (Altonaga, J.) and fn 15, *Infra.*

Second, the MDL Court demonstrated confusion as to the applicability of the economic loss doctrine in New York holding: "New York tort law imposes no general duty to protect against purely economic losses. *In fact, the 'economic loss doctrine' suggests the opposite is true*.'" Dkt. 525 at 26. (emphasis added). The "opposite" meaning what? That New York tort law *does* impose a general duty to protect against purely economic loss? That is clearly not what the MDL Court meant, but in any event, there is no "suggestion" under the economic loss doctrine, but rather a doctrine that is to be fairly applied. While the MDL Court does enter into the fray as to apparent confusion between the economic loss doctrine and the economic loss rule, the MDL Court ignored the critical part of Judge Pauley's thoughtful analysis in *AMBAC* where he concluded that whether the analysis is under the economic loss doctrine or the economic loss rule, the plaintiffs there have sufficiently stated a negligence claim because – looking at the economic loss doctrine only – "[a]s discussed, the economic loss doctrine centers on whether the defendant owed a duty to protect against the risk of harm to the plaintiff." *AMBAC*, 159. Plaintiffs do allege such a duty in general and in a fiduciary duty context as well in that securities broker-dealers as agents cannot place their own financial interests above of and to the detriment of their professional customers. By guarding against the possibility of depositing increased collateral Apex took affirmative steps through the Market Suspension to drive down the market price of the Suspended Stocks

guaranteeing a harmful outcome to Apex's customers – both shared and direct. The MDL Court's failure to acknowledge the existence of such a duty requires that the MDL Court's holding based upon the economic loss doctrine be overturned.

In considering the economic loss doctrine, the MDL Court also misunderstood the fundamental underpinnings of the doctrine as expressed in *AMBAC*, that the "doctrine rests on the principle that economic losses arising from injury to expectancy interests created by contract ought to be brought as contract claims, but also 'reflects a policy interest in protecting defendants from disproportionate, and potentially limitless, liability.'" *AMBAC* at 159. The MDL Court concluded that New York Courts keep "pure economic loss, unaccompanied by property damage or physical harm" within the traditional "purview of contract law." Dkt. 525 at 27. The MDL Court cited to *King County, Wash. v. IKB Deutsche Industriebank AG*, 863 F. Supp. 2d 288, 302 (S.D.N.Y. 2012) in support. But *IKB* was decided six years prior to *AMBAC*. If Judge Scheindlin is read to have believed in *IKB* that the negligence action was foreclosed under contract principles, that holding was expressly disavowed in *AMBAC*. But, in fact, Judge Scheindlin in *IKB* did not rule out the possibility of negligence liability absent contract claims under the economic loss doctrine. Judge Scheindlin held: "[b]ecause plaintiffs have *failed to allege* that defendants owed them a professional responsibility to structure the Rhinebridge SIV in a certain fashion, their negligence claim is barred by the

economic loss doctrine." *Id.* at 304 (emphasis added). Unlike *IKB*, Plaintiffs here specifically *allege* that Apex owed them a duty in connection with the complained of transaction. If there is any concern about Apex being exposed to "disproportionate, and potentially limitless [or duplicative] liability" (Dkt. 525 at 27), because of exposure to contract claims as well –Plaintiff has not asserted contract claims in this case other than alternatively and then only for the attendant breach of the covenants of good faith and fair dealing.

The MDL Court's misunderstanding of New York's application of the economic loss doctrine, was further demonstrated by its failure to address the recent September 2022 updated *AMBAC* decision where Judge Engelmayer cited to and expanded upon the late Judge Pauley's earlier decision and refused US Bank's invitation to overrule the earlier opinion. Judge Engelmayer noted:

> U.S. Bank next reprises an argument Judge Pauley rejected at the motion to dismiss phase: that the economic-loss doctrine bars Ambac's fiduciary-duty claims as duplicative of the contract claims. U.S. Bank describes the claims as resting on identical conduct and resulting in identical harm. In *Ambac I*, Judge Pauley held that, to survive U.S. Bank's economic-loss challenge, Ambac's fiduciary-duty claims needed only to be based on a distinct, extracontractual duty. **The breach of contract and fiduciary-duty claims could coexist, he held, even if they sought identical [\*57] damages**. *Ambac I*, 328 F. Supp. 3d at 158 (emphasis added).

*Ambac Assur. Corp. v. U.S. Bank N.A.*, 2022 U.S. Dist. LEXIS 179380, at

\*56-57 (SDNY, Sept. 30, 2022).

To the extent the MDL Court found substantive New York law to be unsettled regarding the economic loss doctrine, Plaintiffs respectfully submit that it was improper for the MDL Court to attempt to resolve any dispute among New York Courts. Rather, it should have sought to have the issue certified to the appropriate New York court.

Ultimately, the proper application of the economic loss doctrine turns on a duty analysis. Here, the MDL Court misconstrued both Apex's duty to Plaintiffs and what precisely Plaintiffs must allege to not run afoul of the economic loss doctrine. For example, the MDL Court ruled that "[t]o get around the economic loss rule, [Plaintiffs] must demonstrate that they enjoyed a 'special relationship' with Defendant. *AMBAC Assurance Corp.*, 328 F. Supp. 3d at 159 (alteration added)." Dkt. 525 at 27.

But that is not what *AMBAC* held. *AMBAC* held, [u]nder the economic loss doctrine, a defendant is not liable in tort for purely economic loss unless the plaintiff demonstrates that the defendant owed a duty, which 'may arise from a special relationship[,] . . . to protect against the risk of harm to plaintiff.'" *Finlandia Ctr., Inc.,* 750 N.E.2d at 1101, 1103. *AMBAC Assurance Corp.*, 328 F. Supp. 3d at 159. Here, as Plaintiffs pled, and argued below, the duty that is owed arises a matter of law as well as being grounded in Apex's obligation as a FINRA member broker-dealer that owes duties to Plaintiffs. And, because under the law Apex also owes

fiduciary duties to Plaintiffs, there exists the "special relationship" the MDL Court referred to. In other words, the "special relationship" alone is not a predicate to liability, but only an example as to how such relationship "may arise." The proper inquiry is the existence of a duty and breach of that duty, both of which exist here.

### E. To The Extent A Special Relationship is Required It was Properly Pled

To the extent a "special relationship" is a predicate under New York law to asserting negligence liability resulting in monetary loss, Plaintiffs have properly pled the existence of such a special relationship. To begin with, the MDL Court stated that "the New York Court of Appeals identified the key baseline: for a relationship to qualify, it must "require[] the defendant to protect against the risk of harm to plaintiff." 96 N.Y.2d 280, 289 (N.Y. 2001)." Dkt. 525 at 27. Here, Plaintiffs alleged that the broker-dealer is prohibited from engaging in conduct designed to harm the plaintiffs in connection with the transaction entered into between them while at the same time advantaging itself. As demonstrated herein, both industry regulations and the development of fiduciary law in New York support Plaintiffs' argument.

In considering the "special relationship" analysis, the MDL Court noted:

So far, courts have applied the exception to landowners and tenants, *see Finlandia Ctr., Inc.*, 96 N.Y.2d at 289 (citing *Nallan v. Helmsley-Spear, Inc.*, 50 N.Y.2d 507, 518– 19 (N.Y. 1980)); a "limited" set of professionals [citation omitted] dealing with clients, *Hydro Inv'rs, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 18 (2d Cir. 2000); and relationships in which one party owes a fiduciary duty to the other,

*see Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 329 (S.D.N.Y. 2011) (citations omitted).

Dkt. 525 at 27-28.

The MDL Court then stated, "[t]he first two categories are inapt here, but the third [category, regarding fiduciary duty] presents a closer question." Dkt. 525 at 28. The MDL Court then proceeded to find Apex had no liability in negligence to Plaintiffs because it was a clearing broker that owed no fiduciary duties to Plaintiffs. Dkt. 525 at 27-28.

This holding was error. Breach of a "fiduciary duty" is not a prerequisite to finding liability under the economic loss doctrine – just the finding of a breach of duty is sufficient. Moreover, Plaintiffs have alleged that Apex breached its fiduciary duties to both its direct customers and its Shared Customers. The MDL Court improperly inserted a requirement that a broker dealer be alleged to have committed fraud to sustain a breach of fiduciary claim against a clearing broker – but, as demonstrated below, New York law makes no such requirement.

## II. THE MDL COURT ERRED IN DISMISSING PLAINTIFFS' BREACH OF FIDUCIARY DUTY CLAIM

Plaintiffs have alleged that Apex breached fiduciary duties to both its Shared Customers and to its direct broker-dealer customers. ¶¶ 114-121. In New York, "[i]n order to establish a breach of fiduciary duties, a plaintiff must prove the

42

existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct." *Kurtzman v. Bergstol*, 835 N.Y.S. 2d 644 (2nd Dep't 2007). Under New York law the nature of the relationship between stockbroker and investor/customer is a fiduciary relationship. *Conway,* 16 F.3d, at 510.

Where, as here, the customer's account at issue is a non-discretionary account, the broker's fiduciary duty to the customer is in connection with the transaction. *de Kwiatkowski,* 306 F.3d at 1305 ("On a transaction-by-transaction basis, the broker owes duties of diligence and competence in executing the client's trade orders…. No doubt, a duty of reasonable care applies to the broker's performance of its obligations to customers with nondiscretionary accounts.").

Here, that transaction was the sale by the broker of the Suspended Stocks to the customer. The clearing broker then took direct action to force the price of the stocks sold to the customer to decrease in value. That action was engaged in solely for the benefit of the broker. The Court was obligated to accept the truth of those factual allegations in the pleadings in evaluating whether Plaintiffs adequately pled a claim for breach of fiduciary duty. Here, the MDL Court improperly ignored the allegations in its consideration of Apex's motion to dismiss.

As Plaintiffs argued to the MDL Court "the duties alleged are transactional in that the duties arose in connection with the sale of securities to Plaintiffs and the Class." Dkt. 494 at 34.

Significantly, the MDL Court, in the related Robinhood MDL proceeding asserting securities fraud, found that Plaintiffs successfully alleged that a broker-dealers' deliberate attempt to reduce the price of securities, to the detriment of the brokers' customers and for its own advantage, successfully made out a claim for market manipulation. *In re January 2021 Short Squeeze Trading Litig.* (Securities Tranche), 2022 U.S. Dist. LEXIS 143699 (S.D. FL Aug. 11, 2022 (Altonaga, J.). In reaching that conclusion, this same MDL Court adopted an expansive view of the word "transaction" finding that "transaction" under the securities law went beyond the simple execution of a purchase or sale of a security.[15]

Here, as to the question of whether Apex owed Plaintiffs a fiduciary duty, the MDL Court incorrectly failed to consider the totality of the pleadings giving Plaintiff the benefit of all favorable factual inferences as required on this pleading motion. For example, the MDL Court found that "[i]n most cases, clearing brokers like Defendant "do not owe a fiduciary duty to the customers of an introducing

---

[15] "Consistent with the dictionary's definition, courts have broadly interpreted 'transaction' under section 9(a)(2)." *In re January 2021 Short Squeeze Trading Litig.*, 2022 U.S. Dist. LEXIS 143699 at *44.

broker." *Greenfield v. Tassinari*, 8 A.D.3d 529, 530–31 (N.Y. Sup. Ct. App. Div. 2004) (collecting cases).[14] But as explained, this situation is not the typical clearing broker-dealer situation. The Plaintiff customers are not those of the Introducing Broker alone, but also customers of Apex as they are shared between the two broker-dealers. (*See* ¶¶ 1, 14, 18)." Dkt. 525 at 28.

Clearly, if Webull as introducing broker had sold the Suspended Stocks to Plaintiffs and then turned around and prohibited Plaintiffs from trading in such stocks in order to preserve the value of its own holdings, a breach of fiduciary duty claim would be viable for acting in its self-interest to the detriment of its client. Here, the clearing broker, Apex, abandoned its merely ministerial role and took complete control over the buying/selling process for its own gain. Thus, the acts of the clearing broker here involved the type of "active" and "direct" participation in the wrongful conduct which under New York law demonstrates that the clearing broker stepped out of its role of providing merely routine services and became liable for breach of fiduciary duty as a primary actor. *McDaniel*, 196 F.Supp.2d343; *Rozsa*, 152 F.Supp.2d, at 531-32 ("Clearing brokers may have a fiduciary duty to investors in certain extenuating circumstances"). As the Court held in *Overstock.com, Inc. v. Goldman Sachs & Co.*, 231 Cal.App.4th 513, 547 (2014), a clearing broker may be liable where it engages in "initiating, instigating, and orchestrating the scheme", or where it has "hands-on involvement" or "participates in 'key decisions' about the

'details' of the exotic trades" (citing to *Scone Investments, L.P. v. American Third Market Corp.*, No. 97 Civ. 3802 (SAS) 1998 WL 205338 at *8-9 (S.D.N.Y. Apr. 28, 1998)).

The precise role of Apex and how its actions went beyond the ministerial role typically performed by clearing brokers is set out clearly in the factual allegations of the Complaint.

Whether a clearing broker owes fiduciary duties to a customer is fact dependent. Under New York law:

> When acting within the scope of their traditional clearing functions, clearing brokers owe no fiduciary duties to securities purchasers. *Rozsa I*, 152 F. Supp. 2d at 531. ***In "extenuating circumstances," however, clearing brokers may owe investors fiduciary duties. Id. For example, where an agreement exists between the clearing agent and investor, fiduciary duties may arise****.* Id. **Moreover, fiduciary duties may exist where a clearing broker asserts control over the introducing broker's business, or becomes actively and directly involved in an introductory broker's actions***.
> *Global Enter. Group Holding, S.A. v. Ottimo*, 2020 U.S. Dist. LEXIS 145126,

at *16 (E.D.N.Y. June 8, 2010) (emphasis added).[16]

Plaintiffs allege "extenuating circumstance" in that Apex's misconduct directed at its Shared Customers with the Introducing Broker-Dealers was not in

---

[16] In *Rozsa* , 152 F. Supp. 2d at531 (S.D.N.Y. 2001), the Court held, "[i]n short, the complaint *fails to allege facts* on which the Court could find that SG Cowen acted as anything other than a generic clearing agent that acted only through May Davis. As a result, SG Cowen had no fiduciary duty to Rozsa.") (emphasis added).

connection with "traditional" or "generic" clearing functions. Rather, the Market Suspension ordered by Apex and followed by the Introducing Broker-Dealers, as they were required to do, was a factual allegation of Apex becoming "actively and directly involved in an introductory broker's actions." The MDL Court, as demonstrated in the quote from the MDL Court below, agreed with Plaintiffs' characterization.

The MDL Court, however, found that Apex escaped potential liability both for negligence (under the Economic Loss Doctrine) and for breach of fiduciary duty because Apex's conduct was not alleged as "fraudulent" in connection with its one-sided Market Suspension on January 28, 2021.

The MDL Court held:

> This is where Plaintiffs miss the mark. They insist that Defendant exceeded its traditionally ministerial role of guaranteeing trades by actively shutting down buy-side trades. (*See* Resp. 54). The Court does not disagree. But Plaintiffs never allege that Defendant, or anyone else for that matter, engaged in fraud. (*See generally* Am. CAC). This omission is fatal. Plaintiffs cite no New York cases — and the Court is aware of none— holding that a clearing broker owed its investors a fiduciary duty outside the fraud context. (*See generally* Resp.). Notably, every single case that Plaintiffs cite in support of applying New York law's extenuating circumstances exception involved fraud allegations... (*See id*. 54). Because Plaintiffs do not allege this crucial element, the extenuating circumstances exception does not apply here.

Dkt. 525 at 29-30.

But New York law does not and has never "required" a fraudulent component to breach of fiduciary duty claims. The MDL Court's erroneous imposition of such a "requirement" (Dkt. 525 at 30) is not New York law. In fact, Defendant never argued that allegations of fraud are a prerequisite for a clearing broker's breach of fiduciary liability. More to the point, and as argued below, a claim for fraud is not a predicate to a breach of fiduciary claim for either an introducing broker, a direct broker or a clearing broker. This makes sense when the conduct is otherwise improper, injurious and involves active and direct participation of the clearing broker that contravenes what is otherwise routine ministerial duties.

The MDL Court found that Plaintiffs had properly alleged that Apex, as the clearing broker, had gone "beyond its traditionally ministerial role of the 'conduit' and become 'actively engaged' in trades." Dkt. 525 at 29. That "active engagement" in trades which were the subject of the Complaint is all that is required. However, the MDL Court found that Plaintiffs had not properly alleged a second "requirement." Insisting on that second requirement, "that the clearing broker must have been actively involved in fraud," (*Id.*) was error as New York law imposes no such "second requirement" that the underlying conduct charged must necessarily be fraudulent.

The *McDaniel* case is very clear on this point in its holding that "where a clearing firm moves beyond performing mere ministerial or routine clearing

functions and becomes actively and directly involved in the introductory broker's actions, it may expose itself to liability with respect to the introductory broker's *misdeeds*." (emphasis added). *McDaniel, supra,* 196 F. Supp. 2d at 353 (S.D.N.Y. 2002). In *Global Enter. Group Holding, S.A. v. Ottimo*, 2020 U.S. Dist. LEXIS 145126 at *16. (E.D.N.Y. June 8, 2010), the court sitting in the Southern District of New York held that "fiduciary duties may exist where a clearing broker asserts control over the introducing broker's business, or it becomes actively and directly involved in an introductory *broker's actions*." (emphasis added). Liability may attach because the clearing firm controls "broker's actions." There is no requirement that those broker actions are fraudulent.[17] The fact that plaintiffs in other cases tend to assert causes of action for fraud in disputes over the sales of securities does not immunize brokers – or clearing brokers- from liability for misdeeds, whether or not

---

[17] Other cases that the MDL Court relies upon do not require that fraud be a predicate for the assertion of a breach of fiduciary duty by a Clearing Broker-Dealer, although if fraud is the misdeed asserted then in order to successfully assert clearing firm liability the clearing firm must have directed or participated in the fraud. *See*, *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97-4978-Civ, 2002 WL 88226, at *3 (S.D.N.Y. Jan. 23, 2002); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 584 (S.D.N.Y. 1997); *Goldman v. McMahan, Brafman, Morgan & Co.*, No. 85-2236-Civ, 1987 U.S. Dist. LEXIS 5356 , 1987 WL 12820 (S.D.N.Y. 1987) at * 22.

they are asserted to be fraudulent where the clearing broker is a direct participant in the alleged misconduct.

The MDL Court erroneously held that: "Defendant cannot breach a fiduciary duty to Plaintiffs if it does not owe Plaintiffs a fiduciary duty in the first place." Dkt. 525 at 33-34. The holding is in error because, as described, Apex did owe a fiduciary duty to Plaintiffs. The Court's reasoning again turned on its erroneous imposition of a "fraud" requirement as an element of the pleadings regarding fiduciary law, as it relates to clearing brokers. That requirement is one which New York courts have never imposed under New York law.

## III. THE MDL COURT ERRED IN DISMISSING PLAINTIFFS' ALTERNATIVE BREACH OF GOOD FAITH AND FAIR DEALING CLAIMS

The MDL Court wrongfully dismissed Plaintiffs' alternative claim of breach of good faith and fair dealing with reference to the Three Way Broker Agreement (Customer Sharing Agreement) as between Apex, the Customers (such as Plaintiffs here) and the Introducing Brokers holding that "Plaintiffs would have the Court amend [the] provision [of the agreement allowing for the right to refuse to execute transactions for Plaintiffs at any time and for any reason] and impose new conditions governing when and why Defendant is allowed to refuse to execute transactions." Dkt. 525 at 35. But the MDL Court has only disallowed a "straw man" that the MDL Court itself created.

50

Contrary to the MDL Court's ruling, Plaintiffs have never sought to amend any agreement and never argued the existence of any broker-dealer obligation to execute all transactions. Plaintiffs have expressly disavowed such reading by expressly pleading: " To be clear, Plaintiffs are not alleging that Defendants are barred from placing reasonable restrictions on trading. Defendants are barred however from using their unpreparedness for events – as here - to only restrict partial – one-way trading (purchases) where the intent of such restriction, as here, was to decrease the value of the securities." ¶57.

Rather, what Plaintiffs have alleged (at ¶ 127) is that "Apex by and through the conduct alleged herein, breached the implied covenant of good faith and fair dealing by knowingly restricting one-sided trading (purchases) on January 28, 2021 with the intent of causing the trading price of the Suspended Stocks to go down causing harm, losses and damages to Plaintiffs and the Apex Broker-Dealer Class who had purchased the Suspended Stocks pursuant to the Customer Agreement."

Broker-Dealers need discretion to refuse to accept trading orders on a limited basis. For example, they can refuse orders if they believe that the trade order is illegal or is sought to be procured with stolen, misappropriated or laundered funds.

But what broker-dealers – direct and clearing firms – cannot do is unilaterally halt one way trading for hours for the purpose of driving down the trading price of the security. We know that Apex was not acting simply because of volatility

concerns – if it were, it could have petitioned the exchanges to temporarily halt all trading in the designated stocks as the regulations permit and as, in fact, the stock exchanges did on January 28, 2021. ¶ 55. Even if Apex sought to unilaterally act to lower the volatility – it might have attempted to temporarily halt all trading in the relevant securities. But that is not what Apex did. It engaged in a prolonged halt of only one side of the trade – the purchase – where the knowing consequence of such an action was to drive down the price of the securities Apex had sold to its customers either directly or through its Introducing Brokers pursuant to the Three Way Agreements Apex and its Shared Customers had with the Introducing Brokers.

Accordingly, as Plaintiffs argued below, Apex, "compelled Plaintiffs to enter into 3-way customer agreements making each clearing customer a customer of the Introducing Broker and Apex in connection with each transaction entered. ¶¶ 123-24. Such customer agreement:

> imposes upon each party a duty of good faith and fair dealing in the performance of the agreement such that neither party shall do anything which will have the effect of destroying or interfering with the right of the other party to receive the benefits of the agreement." AC ¶ 125.

Dkt. 494 at 55.

Moreover, Apex cannot use contractual language as a shield to avoid tort liability. Apex as a broker-dealer that owes a duty of care, cannot contract itself out of liability for its own actions. The law provides that "[c]ontractual commitments

cannot serve to excuse carelessness or shield a defendant from liability for injury that a breach of the duty of due care may engender. *See* Restatement (Second) of Torts § 4c." *de Kwiatkowski v. Bear Stearns,* 126 F. Supp. 2d 672, 694 (S.D.N.Y. 2000), *rev'd on other grounds*, *de Kwiatkowski v. Bear Stearns,* 306 F.3d 1293 (2d Cir. 2002).

Apex is also prohibited from contracting itself out of liability by virtue of its membership in FINRA. What Apex characterizes as a "Customer Account Agreement" is a predispute arbitration agreement. D k t .  4 9 1 - 3 at Par. 8. "FINRA Rule 2268 prohibits any predispute arbitration agreement from including any condition that: (1) limits or contradicts the rules of any self-regulatory organization (SRO)… These requirements make clear that predispute arbitration agreements must preserve customers' rights under FINRA rules." See, FINRA Regulatory Notice 21-16, p. 2, *available at* https://www.finra.org/sites/default/files/2021-04/Regulatory-Notice-21-16.pdf.  Dkt. 494 at 39-40.

In stating New York law, the MDL Court correctly noted that "New York law provides that every contract implies 'a covenant of good faith and fair dealing' that "encompasses any promises that a reasonable promisee would understand to be included[.]" *N.Y.U. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995) (citations omitted).  It prevents any party to the contract from doing anything that would restrict the other's ability to reap the fruits of the contract, or to undermine the

other party's "presumed intentions or reasonable expectations." *Spinelli v. NFL*, 903 F.3d 185, 205 (2d Cir. 2018) (citations and quotation marks omitted)." Dkt. 525 at 34 -35.

Here, New York law supports Plaintiffs' alternative allegations of Breach of the Covenant of Good Faith and Fair Dealing in that Apex breached the Shared Customer Agreement between itself, its customers and the Introducing Brokers by undermining Plaintiffs' "ability to reap the fruits of the contract" and by undermining the "presumed intentions or reasonable expectations" of Plaintiffs that Apex would not take action to deliberately cause the price of the securities it sold to Plaintiffs to decrease in value for its own benefit. Accordingly, the MDL Court's ruling dismissing thus Count should be reversed.

## IV. THE MDL COURT ERRED IN DISMISSING PLAINTIFFS' ALTERNATIVE CLAIM FOR TORTIOUS INTERFERENCE

Plaintiffs alleged, alternatively, "that Apex tortiously interfered with Plaintiffs' business relationship with the Introducing Brokers in shuttering the Introducing Brokers' trading platform for hours so as to prohibit purchases of the Suspended Stocks. ¶¶ 128-136. Plaintiffs satisfy the elements required to plead such claims by alleging the existence of an ongoing business relationship, tortious interference with said relationship, causation and damages.

The MDL Court improperly dismissed Count IV holding that Plaintiffs failure to successfully plead either negligence or breach of fiduciary duty doomed its tortious interference claim, but as demonstrated above, the MDL Court committed error in dismissing both the negligence and breach of fiduciary duty claims. The MDL Court additionally held that even assuming Plaintiffs had successfully pled negligence and breach of fiduciary, Count IV would nevertheless be dismissed because "no court applying New York law has ever held that negligence and breach of fiduciary duty independently constitute "wrongful means" for tortious interference purposes…. Federal courts applying a state's laws must proceed with modesty and avoid "creat[ing] or expand[ing] that State's public policy." Dkt. 525 at 37.

But Plaintiffs have not requested that the MDL Court create or expand on New York law, only that the law be correctly applied. That can even happen in instances where the facts complained of, as here, have never before been before any court because no broker dealer prior to January 28, 2021 (or since) ever committed the acts complained of.

This is precisely the type of situation the New York Court of Appeals left open in considering whether the "sort of egregious wrongdoing that might support a tortious interference claim in the absence of such an independently unlawful act or evil motive." *Carvel Corp. v. Noonan*, 3 N.Y.3d, 182, 188 (2004). In accordance

with the holding in *Carvel,* Plaintiffs have successfully alleged that Apex interfered with a nonbinding "economic relation" that tortiously interfered with Plaintiffs' Business Relationship with Apex.

## **CONCLUSION**

For the foregoing reasons, the judgment below should be reversed.

Respectfully Submitted,

*/s/ Peter Safirstein*
Peter Safirstein
Safirstein Law LLC
45 N. Broad Street
Suite 100
Ridgewood, NJ 07450
psafirstein@safirsteinlaw.com
T: 917-952-9458

Gary S. Graifman
Daniel C. Edelman
KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.
16 Squadron Blvd., Suite 106
New City, New York 10956
T: 845-356-2570
ggraifman@kgglaw.com

Rachel Wagner Furst
Fla. Bar No. 45155
Maderal Byrne & Furst PLLC
2800 Ponce de Leon Boulevard
Suite 1100
Coral Gables, Florida 33134
rachel@maderalbyrne.com
T: 305-520-5690

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) as the brief contains 12,885 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

*/s/ Peter Safirstein*

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2023, 4 copies of the brief were dispatched for delivery to the Clerk's Office of the United States Court of Appeals for the Eleventh Circuit by third-party commercial carrier for overnight delivery at the following address:

David J. Smith
Clerk of Court
U.S. Court of Appeals for the 11th Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

On this same date, a copy of the brief was served on all counsel of record via CM/ECF.

*/s/ Catherine B. Simpson*
Counsel Press
1011 East Main Street
Richmond, VA 23219
(804) 648-3664

Filing and service were performed by direction of counsel