IN THE

# United States Court of Appeals

FOR THE

# Eleventh Circuit

IN RE: JANUARY 2021 SHORT SQUEEZE TRADING LITIGATION,

PETER JANG, ERIK CHAVEZ,

*Plaintiffs-Appellants,*

v.

APEX CLEARING CORPORATION,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
HONORABLE CECILIA M. ALTONAGA, CHIEF U.S. DISTRICT JUDGE
NO. 1:21-MD-02989-CMA

## ANSWERING BRIEF OF DEFENDANT-APPELLEE

J. Mark Gidley (DCB 417280)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 626-3600
mgidley@whitecase.com

Jack E. Pace III (NYSB 2947372)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
jpace@whitecase.com

Angela Daker (FB 681571)
200 South Biscayne Blvd.
Suite 4900
Miami, FL 33131
Telephone: (305) 995-5297
adaker@whitecase.com

*Attorneys for Defendant-Appellee*

June 21, 2023

## **CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Circuit Rules 26.1-2 and 26.1-3, the undersigned counsel hereby certify as follows:

Defendant-Appellee Apex Clearing Corporation (private company) is a subsidiary of parent corporations Apex Fintech Solutions Inc. (direct) and PEAK6 Investments LLC (indirect), and no publicly traded corporation owns 10% or more of Apex Clearing Corporation's stock.

The following is a complete list, in alphabetical order, of interested persons:

1. Altonaga, Cecilia M. (Chief U.S. District Judge, Southern District of Florida)

2. Apex Clearing Corporation (Defendant/Appellee)

3. Apex Fintech Solutions Inc. (direct parent corporation to Appellee)

4. Burke, Heather Marie (Counsel for Appellee)

5. Chavez, Erik (Plaintiff/Appellant)

6. Daker, Angela (Counsel for Appellee)

7. Furst, Rachel W. (Counsel for Appellants)

8. Gant, Bryan (Counsel for Appellee)

9. Gidley, J. Mark (Counsel for Appellee)

10. Graifman, Gary S. (Counsel for Appellants)

11. Grossman Roth Yaffa Cohen, P.A. (Law Firm for Appellants)

12.    Jang, Peter (Plaintiff/Appellant)

13.    Kantrowitz Goldhamer & Graifman, P.C. (Law Firm for Appellants)

14.    Pace, Jack E. (Counsel for Appellee)

15.    PEAK6 Investments LLC (indirect parent corporation to Appellee)

16.    Safirstein Metcalf LLP/Safirstein Law LLC (Law Firm for Appellants)

17.    Safirstein, Peter (Counsel for Appellants)

18.    Schofield, Lorna G. (U.S. District Judge, Southern District of New York)

19.    White & Case LLP (Law Firm for Appellee)

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee Apex Clearing Corporation submits that Judge Altonaga's well-reasoned opinion can be affirmed without oral argument, but respectfully requests that the Court permit Appellee equal time if the Court holds oral argument.

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT .................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF AUTHORITIES ................................................................ v

STATEMENT OF THE ISSUES ............................................................ 1

STATEMENT OF THE CASE ............................................................... 2

    I.    STATEMENT OF THE FACTS.......................................................... 2

        A.    The Meme Stock Short Squeeze ............................................. 2

        B.    Apex Clearing Corporation and the Role of Clearing
                Brokers ................................................................ 4

        C.    Margin Requirements for Clearing Brokers ............................. 7

        D.    The Customer Agreement Among Apex Clearing,
                Introducing Brokers, and Customers of Introducing
                Brokers Provides for the Right to Refuse Trades "For
                Any Reason"........................................................... 8

        E.    The Events of January 28, 2021 .......................................... 8

    II.    PROCEEDINGS BELOW....................................................... 10

    III.    STANDARD OF REVIEW...................................................... 13

SUMMARY OF THE ARGUMENT ..................................................... 13

ARGUMENT............................................................................ 15

    I.    THE DISTRICT COURT CORRECTLY DECLINED TO CREATE THE
        NOVEL COMMON LAW DUTIES PLAINTIFFS SEEK TO CREATE
        HERE ...................................................................... 16

        A.    Apex, as Plaintiffs' Clearing Broker, Owes No Fiduciary
                Duty to Plaintiffs....................................................18

1.  Apex as a Clearing Broker Owed No Fiduciary Duties to the Introduced Customers Here......................19

2.  Even Introducing Brokers, and Broker-Dealers Generally, Have No Duty to Accept Trades Under Longstanding New York Law (*Busch*)..........................21

3.  Apex Clearing's Customer Agreement Granted Apex the Right to Refuse Trades "At Any Time And For Any Reason"....................................................25

4.  Plaintiffs Do Not Plead Facts that Would Establish that Apex Falls within the Narrow Liability Exception for Clearing Brokers Who Participate in Introducing Brokers' Fraud............................................30

5.  This Court Should Reject Plaintiffs' Novel Argument that Apex, Having Provided Clearing Services for the Purchase of Plaintiffs' Meme Stocks, Then Had a Never-Ending Duty to Protect the Value of Those Stocks .............................................34

B.  Apex Owes No Duty to Named Plaintiffs under New York Negligence Law ................................................37

1.  As a Clearing Broker, Apex Owes Named Plaintiffs No General Duty of Care ...............................38

2.  The Specific Duties Plaintiffs Seek to Create Have No Basis in Law.............................................39

3.  The Economic Loss Doctrine Serves as an Independent Bar to Plaintiffs' Negligence Claim ..........45

C.  Apex's Express Contractual Right to Refuse Trades in the Customer Agreement Precludes the Imposition of a Duty of Good Faith and Fair Dealing to Accept All Trades ......................................................................47

II.  THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' TORTIOUS INTERFERENCE CLAIM FOR FAILURE TO ALLEGE "WRONGFUL CONDUCT" ...................................................50

III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT
        DISMISSED PLAINTIFFS' FOURTH COMPLAINT WITH PREJUDICE...........52

CONCLUSION ....................................................................................................53

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*,
  96 N.Y.2d 280 (2001) ...............................................................38, 46

*Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*,
  18 N.Y.3d 675 (2012) .......................................................................41

*A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*,
  2002 U.S. Dist. LEXIS 980, 2002 WL 88226 (S.D.N.Y. 2002) .................. 30-31

*Alwert v. Cox Communs., Inc. (In re Cox Enters., Inc. Set-Top Cable TV Box Antitrust Litig.)*,
  835 F.3d 1195 (10th Cir. 2016) ........................................................17

*AMBAC Assurance Corp. v. US Bank Nat'l Ass'n*,
  328 F. Supp. 3d 141 (S.D.N.Y. 2018) ...........................................46, 47

*AMBAC Assurance Corp. v. US Bank Nat'l Ass'n*,
  2022 U.S. Dist. LEXIS 179380 (S.D.N.Y. 2022) .............................................46

*Andrea Juncadella, et al. v. Robinhood Fin. LLC, et al.*,
  No. 22-10669 (11th Cir. Mar. 2, 2022) .............................................10

*Berwecky v. Bear, Stearns & Co.*,
  197 F.R.D. 65 (S.D.N.Y. 2000) .......................................................34

*Busch v. L.F. Rothschild*,
  23 A.D.2d 189 (1st Dep't 1965)............. 16, 21, 22, 23, 24 29, 33, 40, 42, 49, 52

*Capital Options Invest., Inc. v. Goldberg Bros. Commodities, Inc.*,
  1990 U.S. Dist. LEXIS 14736 (N.D. Ill. Oct. 24, 1990),
  *aff'd*, 958 F.2d 186 (7th Cir. 1992) ...............................24, 29, 33, 41, 50, 51, 52

*Carvel Corp. v. Noonan*,
  3 N.Y.3d 182 (2004) ...............................................................50, 51

*Chief Authorities are marked with an asterisk
*Clarex Ltd. v. Natixis Sec. Am. LLC*,

2013 U.S. Dist. LEXIS 82632 (S.D.N.Y. Jun. 11, 2013)......................35, 37, 41

*Connolly v. Havens*,
   763 F. Supp. 6 (S.D.N.Y. 1991).................................................................18, 20

*Conway v. Icahn & Co.*,
   16 F.3d 504 (2d Cir. 1994)...............................................................................28

*Cordero v. Transamerica Annuity Serv. Corp.*,
   No. 21, slip op. (N.Y. 2023)........................................................................48, 49

*\*Courtland v. Walston & Co.*,
   340 F. Supp. 1076 (S.D.N.Y. 1972) .............................................23, 24, 40, 49

*Cromer Fin. v. Berger*,
   137 F. Supp. 2d 452 (S.D.N.Y. 2001) ............................................................31

*DeBlasio v. Merrill Lynch & Co.*,
   2009 U.S. Dist. LEXIS 64848 (S.D.N.Y. July 27, 2009)..................................21

*\*de Kwiatkowski v. Bear, Stearns & Co.*,
   306 F.3d 1293 (2d Cir. 2002)................ 25, 28, 29, 34, 35, 36, 37, 38, 42, 43, 45

*Dercole v. Divico Fin. of Am.*,
   2005 US Dist. LEXIS 59757 (E.D.N.Y. Dec. 20, 2005).............................32, 42

*Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*,
   602 F.2d 478 (2d Cir. 1979)......................................................................19, 20

*Eiber Radiology, Inc. v. Toshiba Am. Med. Sys.*,
   673 F. App'x 925 (11th Cir. 2016)...................................................................13

*Eva Rioseco and Nilda Cruz v. Gamco Asset Management, Inc.*,
   2011 N.Y. Misc. LEXIS 7279 (N.Y. Sup. Ct. Sept. 23, 2011)..........................44

*Flickinger v. Harold C. Brown & Co.*,
   947 F.2d 595 (2d Cir. 1991)............................................................................19

*Fox v. Lifemark Sec. Corp.*,

84 F. Supp. 3d 239 (W.D.N.Y. 2015)................................................................43

*French v. Bache Halsey Stuart Inc.*,
  Comm. Fut. L. Rep. (CFTC 1977) ......................................................24, 30, 52

*Galigher v. Jones*,
  129 U.S. 193 (1889)................................................................23, 24, 33, 52

*Glob. Enter. Grp. Holding, S.A. v. Ottimo*,
  2010 U.S. Dist. LEXIS 145126 (E.D.N.Y. June 8, 2010)..................................30

*Goldman v. McMahan, Brafman, Morgan & Co.*,
  1987 U.S. Dist. LEXIS 5356 (S.D.N.Y. 1987)..........................................31, 34

*Greenfield v. Tassinari*,
  8 A.D.3d 529 (2d Dep't 2004) ............................................................38

*Guard-Life Corp. v. Parker Hardware Mfg. Corp.*,
  50 N.Y.2d 183 (1980) ......................................................................51

*Hamilton v. Beretta U.S.A. Corp.*,
  96 N.Y.2d 222 (2001) ......................................................................38

*Hand v. Dean Witter Reynolds Inc.*,
  889 S.W.2d 483 (Tex. Ct. App 1994)..................................................23-24, 49

*Imperato v. Navigators Ins. Co.*,
  777 F. App'x 341 (11th Cir. 2019)......................................................52-53

*In re Blech Sec. Litig.*,
  961 F. Supp. 569 (S.D.N.Y. 1997) ....................................................31, 34

*Ingle v. Glamore Motor Sales, Inc.*,
  73 N.Y.2d 183 (1989) ......................................................................27

*Le Marchant v. Moore*,
  150 N.Y. 209 (1896)........................................................................22

*Levitt v. J.P. Morgan Sec., Inc.*,

710 F.3d 454 (2d Cir. 2013) ....................................................19, 32

*McDaniel v. Bear Stearns & Co.*,
196 F. Supp. 2d 343 (S.D.N.Y. 2002) .........................20, 21, 30, 33, 39

*Moran v. Kidder Peabody & Co.*,
617 F. Supp. 1065 (S.D.N.Y. 1985) ................................................24

*Mraz v. JPMorgan Chase Bank, N.A.*,
2018 U.S. Dist. LEXIS 75217 (E.D.N.Y. May 3, 2018)............................ 43-44

*Murphy v. Am. Home Prods. Corp.*,
58 N.Y.2d 293 (1983) ..................................................................48

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Xerox Corp.*,
25 A.D.3d 309 (N.Y. Sup. Ct. App. Div. 2006)................................................48

*NBT Bancorp v. Fleet/Norstar Fin. Grp.*,
87 N.Y.2d 614 (1996) .............................................................50, 51

*Overstock.com, Inc. v. Goldman Sachs & Co.*,
231 Cal. App. 4th 513 (Cal. 1st App. 2014) ....................................31

*Palsgraf v. Long Is. R. R. Co.*,
248 N.Y. 339 (1928) ..................................................................40

*Posner v. Lewis*,
18 N.Y.3d 566 (2012) ..................................................................50

*Press v. Chemical Inv. Servs. Corp.*,
166 F.3d 529 (2d Cir. 1999)........................................................24

*Pulka v. Edelman*,
40 N.Y.2d 781 (1976) ..................................................................40

*Ross v. Bolton*,
904 F.2d 819 (2d Cir. 1990)........................................................19

*Rozsa v. May Davis Grp., Inc.*,

152 F. Supp. 2d 526 (S.D.N.Y. 2001) ........................................................19, 31

*Rozsa v. May Davis Grp., Inc.*,
   187 F. Supp. 2d 123 (S.D.N.Y. 2002) ..............................................39

*Salinero v. Johnson & Johnson*,
   995 F.3d 959 (11th Cir. 2021) ..........................................................16

*Schwarz v. Bear Stearns Cos., Inc.*,
   266 A.D.2d 133 (1st Dep't 1999) ....................................................39

*Schwarz v. Bear Stearns & Co.*,
   1998 N.Y. Misc. LEXIS 751 (N.Y. Sup. Ct. Aug. 24, 1998) ...........39

*Scone Invs., L.P. v. Am. Third Mkt. Corp.*,
   1998 U.S. Dist. LEXIS 5903 (S.D.N.Y. Apr. 27, 1998) ...................31

*Scott v. Dime Sav. Bank of New York, F.S.B.*,
   886 F. Supp. 1073 (S.D.N.Y. 1995) .................................................44

*Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   465 F. Supp. 1233 (S.D.N.Y. 1979) .................................................44

*\*SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*,
   600 F.3d 1334 (11th Cir. 2010) ...........................................21, 27, 36

*\*Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*,
   305 F.3d 1293 (11th Cir. 2002) .......................................................18

*Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
   464 F. Supp. 3d 634 (S.D.N.Y. 2020) ..............................................44

**Statutes**

11th Cir. R. 28-5 ........................................................................................3

FINRA Rule 2310(b)(2)(B)........................................................................43

Securities Exchange Act § 9, 15 U.S.C. § 78i (1988), (1934)............5, 36
**Other Authorities**

Charles Meyer, LAW OF STOCK BROKERS AND STOCK EXCHANGES (1931) ............22

Financial Industry Regulatory Authority (FINRA),
    Regulatory Notice (21-12), *Customer Order Handling, Margin and Liquidity*
    (Mar. 18, 2021) ...............................................................................................45

Henry Minnerop, *Role and Regulation of Clearing Brokers*,
    48 BUS. LAW. 841 (1992) ...........................................................................33, 49

*Henry Minnerop, *Role and Regulation of Clearing Brokers—Revisited*,
    75 BUS. LAW. 2201 (2020) ........................................................................4, 5, 6

James A. Fanto, Jill I. Gross & Norman S. Poser, BROKER-DEALER LAW AND
    REGULATION (Fifth Ed., 2023-2 Supp. 2018) ............................................17, 25

Joel Seligman, Louis Loss & Troy Paredes,
    SECURITIES REGULATION (6th Ed. 2021) ..............................................................5

U.S. Securities and Exchange Commission (SEC),
    *Staff Report on Equity and Options Market Structure Conditions in Early 2021*
    (Oct. 14, 2021)................................................... 2, 7, 12, 26, 39, 42

U.S. Securities and Exchange Commission (SEC), Investor Alerts and Bulletins,
    *Thinking About Investing in the Latest Hot Stock?:*
    *Understand the Significant Risks of Short-Term Trading Based on Social Media*
    (Jan. 30, 2021) ....................................................................................26, 33, 49

Written Testimony of Michael C. Bodson, CEO, Depository Trust & Clearing
    Corporation (DTCC), before U.S. House of Representatives Committee on
    Financial Services, House Hearing "*Game Stopped?  Who Wins and Loses When
    Short Sellers, Social Media, and Retail Investors Collide*"
    (May 6, 2021) ........................................................................3-4, 6, 7, 12, 49

## STATEMENT OF THE ISSUES

Can a clearing broker exercise its contractual and legal rights under controlling New York law to "refuse to execute securities transactions for the Customer at any time and for any reason," where the clearing broker faces unprecedented capital requirements caused by what the Depository Trust & Clearing Corporation (DTCC) described as unusually high volumes and price volatility in the sale of "meme stocks," or should a federal court sitting in diversity jurisdiction eliminate those rights to create new tort duties requiring clearing brokers to have unlimited capital and accept all trade requests?

## STATEMENT OF THE CASE

## I.   STATEMENT OF THE FACTS

### A.   The Meme Stock Short Squeeze

This case arises out of the COVID-era "meme stock" trading frenzy of early 2021. Social media promotion of these stocks on Reddit and elsewhere led to astronomical price increases, enormous trading volumes, and corresponding volatility. *See* Safirstein Decl. Ex. 1, Dkt. 494-2 (SEC Staff Report on Equity and Options Market Structure Conditions in Early 2021, Oct. 14, 2021) (hereinafter "SEC Staff Report") at 4, 19, 45.

Plaintiffs Erik Chavez and Peter Jang ("Named Plaintiffs") purchased and sold shares of GameStop Corporation (GME) and AMC Entertainment Holdings (AMC)[1] (collectively with Koss Corporation (KOSS), the "Meme Stocks") during this period of significant volatility in and around January 2021. At that time, institutional investors, hedge funds, and others had taken short positions, or effectively bet against, the "Meme Stocks" (Opinion, Dkt. 525 ("Op.") at 1–2), in part due to the stocks' poor COVID-era fundamentals: brick and mortar stores like GameStop were deserted, movie theaters like AMC were shut down, and Koss had

---

[1] Named Plaintiffs did not purchase KOSS stock, but purport to represent a class of investors who did. Amended Class Action Complaint, Dkt. 483 ("Am. CAC") at 6 ¶ 15, 7 ¶ 19; *see also id.* at ¶ 98 (class allegations).

lost enormous share to newer competitors.[2]  Plaintiffs were part of the contrary

social-media-driven speculative bubble, purchasing those same Meme Stocks en

masse in an effort to pump up their value, presumably with a plan to later dump the

inflated stock.  *See* Op. 1–2; Am. CAC ¶¶ 19, 65 (plaintiff Jang held 3,500 GME

shares on Jan. 27, 2021, "GME's stock … reach[ed] a closing high of $347.51", a

value of $1,216,285).   Thus, Wall Street "shorts" were "squeezed" by this

unexpected buyer side frenzy from the meme stock speculators.

The result of this dramatic increase in trading volumes was extreme volatility

in the market and pressures on the market's central clearinghouses like the National

Securities Clearing Corporation ("NSCC"):

> During the week of January 25, 2021, the market saw unusually high
> volumes and price volatility in certain securities that had been
> popularized on internet message boards, including GameStop. …
> NSCC experienced the two highest transaction volume days in its
> history on Wednesday, January 27 and Thursday, January 28.  Risk at
> NSCC … also increased substantially on January 28, to $33.5 billion
> … .

Testimony of Michael C. Bodson, CEO, Depository Trust & Clearing Corporation

(DTCC), before the U.S. House of Representatives, Committee on Financial

Services, House Hearing "*Game Stopped?  Who Wins and Loses When Short Sellers,*

---

[2] Record references according to 11th Cir. R. 28-5 refer to the MDL docket, 1:21-
md-02989 (S.D. Fla. Apr. 1, 2021), unless otherwise indicated.

*Social Media, and Retail Investors Collide*" (May 6, 2021) ("Bodson Testimony") at 4, incorporated by reference by Am. CAC ¶¶ 33, 38.[3]

### B. Apex Clearing Corporation and the Role of Clearing Brokers

Apex Clearing Corporation ("Apex") is a registered broker-dealer that serves as a clearing broker for Plaintiffs Jang and Chavez through their introducing brokers, Ally Invest Securities ("Ally") and Webull Financial LLC ("Webull"), respectively. Am. CAC. ¶¶ 14, 18. Clearing refers to the delivery of cash and securities to the 155 member firms of the NSCC which include clearing brokers. Bodson Testimony at 1–2 & n. 1; Am CAC ¶¶ 31–33. Plaintiffs interact with, and direct trades through, introducing brokers Ally and Webull. Their trades are then accepted by Apex, which, as the clearing broker, is responsible for payment and delivery of shares as part of the clearing process. Op. 2–4. Apex does not provide investment advice, and Plaintiffs do not interact with Apex directly; Apex clears the trades that it accepts from Plaintiffs' introducing brokers, Ally or Webull. *See* Op. 2–3.

Clearing brokers like Apex play a vital risk-allocation and management role in the securities markets. Henry F. Minnerop, *Role and Regulation of Clearing Brokers—Revisited,* 75 Bus. Law. 2201, at 2210 (2020). The current structure of the clearance and settlement system emerged in the wake of the Paper Crunch crisis

---

[3] Bodson Testimony available at https://www.dtcc.com/-/media/Files/PDFs/Testimony-of-Michael-Bodson-050621.pdf (incorporated into by reference, Am. CAC, Dkt. 483 ¶¶ 33, 38).

of 1967–1971, a crisis which led to the collapse of many firms due to the inability of brokerage firms to process a sharp increase in trading volume on the New York Stock Exchange.  *See* Seligman, Loss, and Paredes, SECURITIES REGULATION, § 7.E.1. (6th Ed. 2018); Minnerop, 75 BUS. LAW. at 2211.  As a result, in 1975 Congress amended the Securities Exchange Act of 1934 to charge the SEC with regulating the securities transfer and clearing processes, and the SEC in turn took steps to create the clearance and settlement system in place today with appropriate measures to protect investors and market participants generally.  Seligman, Loss, and Paredes, SECURITIES REGULATION, §§ 1.H.3, 7.E.2.; Minnerop, 75 BUS. LAW. at 2212.

Specifically, the SEC oversaw the creation of both the Depository Trust Company ("DTC") and the NSCC, two clearing agencies which became the central hubs of the new clearance and settlement system.  Minnerop, 75 BUS. LAW. at 2213.

Clearing brokers, like Apex, all of whom must be members of the NSCC and DTC, connect introducing brokers, like Webull and Ally, to the exchanges and to the DTC and NSCC.  Minnerop, 75 Bus. Law. at 2213.  Clearing brokers thus serve as the "backbone of the new clearance and settlement system."  Minnerop, 75 BUS LAW. at 2213.

Clearing brokers must engage in substantial risk management. *Id.* at 2210; Op. 4. When a customer defaults on a trade, the clearing firm remains "on the hook" (Op. 4), that is, responsible for settling the executed order to the party not in default:

> Risk management is an essential aspect of the business of a clearing broker. Virtually all orders a clearing broker processes expose it to some financial risk. Even in cash accounts, a clearing firm faces the risk that its introduced customers may not pay for the securities ordered or fail to deliver the securities ordered sold for their accounts. In margin transactions, the clearing broker faces additional risk due to market volatility … . Similarly, in short sales, the clearing firm's risk is in the potentially limitless increase in the market price of the securities sold short, whose price may exceed the financial capacity of the short seller to "cover" the short position.

Minnerop, 75 BUS. LAW. at 2210; *see also* Op. 4 (clearing "is an inherently risky job" (citing the Am. CAC)). And this risk was exacerbated by then-extant "T+2" settlement, which exposes the clearing firm to the interim, potentially substantial, market price fluctuations over two days in the event a purchaser fails to pay for the stock before settlement.[4] Thus, clearing firms face risk for every trade they accept and clear, and those risks increase as the markets become more volatile. Minnerop, 75 BUS LAW. at 2210; Am. CAC ¶¶ 37–38.

---

[4] T+2 settlement refers to the fact that "Securities trades submitted to the NSCC settle at the end of the second business day after submission[.]" Bodson Testimony at 1–2.

## C. Margin Requirements for Clearing Brokers

The NSCC guarantees the performance of clearing brokers in the event of a clearing broker default. Bodson Testimony at 1. As the district court correctly noted, a clearinghouse default "places the entire market at risk." Op. 4. NSCC protects itself from clearing firm defaults by insisting on margin—the posting of collateral—from its clearing broker members (Bodson Testimony, at 1–2), such as Apex. Initial Brief of Appellants ("Br.")[5] 7 & n.4. In times of increased volatility, the NSCC may require clearing brokers to post additional collateral to guard against the risk of defaults, which can occur if "buyers do not carry-through on paying for a stock that has plummeted or sellers do not carry-through on delivering a stock that has skyrocketed." SEC Staff Report, Dkt. 494-2 at 33.

Margin is collected at the start of the trading day "and intraday in volatile markets." Bodson Testimony at 2. The NSCC's margin requirements are "subject to regulatory review and approval" by the SEC under the Exchange Act. Bodson Testimony at 2. A clearing broker that fails to meet margin can have its trading halted by NSCC and its unsettled clearing portfolio liquidated by NSCC. *Id.*

---

[5] Appellants' Brief filed in this Court will be cited as "Br."

**D.** **The Customer Agreement Among Apex Clearing, Introducing Brokers, and Customers of Introducing Brokers Provides for the Right to Refuse Trades "For Any Reason"**

Given these risks, Apex requires the customers of its introducing brokers to sign a Customer Agreement (Br. 50), ("Three Way" Broker Agreement), which includes key terms defining the nature of the relationship—including, most relevant here, Apex's right to refuse to accept trades. Specifically, the Customer Agreement that Plaintiffs Jang and Chavez signed with Apex includes the following terms:

- "You [Apex] have the right to refuse to execute securities transactions for the Customer *at any time* and *for any reason*."

- "The Customer understands that all representatives, employees and other agents with whom the Customer communicates concerning the Customer's account are agents of the Introducing Broker, and not your representatives, employees or other agents *and the Customer will in no way hold you [Apex] liable for any trading losses that the Customer may incur*."

Customer Agreement, Dkt. 491-3 ¶¶ 3, 6 (emphasis added).

**E.** **The Events of January 28, 2021**

On January 28, 2021, at 9:30 a.m. EST, Apex received a report from the NSCC that projected that Apex would need to make a "substantially increased clearing deposit" (i.e., additional collateral) — far in excess of what Apex currently had on deposit. Am. CAC ¶¶ 39, 71, 79, 81. By 10 a.m. EST, the NSCC intraday margin "on AMC and GME alone went from 25% and 0% of market value to 118% and 78.3% of market value, respectively. Meaning that for every $1.00 of AMC

purchased by an end customer, Apex was required to deposit $1.18 with NSCC." Br. 14, n10.

Apex thus took action by restricting its acceptance of new purchase orders of three Meme Stocks from its introducing brokers at approximately 11:30 a.m. EST. Am. CAC ¶ 79. Apex limited its restriction to three of the Meme Stocks because those stocks had been the cause of approximately 90% of the NSCC's collateral projection. Pace Decl. Ex. 1, Dkt. 491-2 at 7.

When Apex announced its decision not to accept purchase orders for three Meme Stocks, it had not yet received notice from the NSCC or the DTC that its anticipated collateral requirements might be reduced. Op. 7. Apex later learned, after the rush of events, that "the reason for the potentially higher NSCC collateral deposit … was an imbalance in trading activity by one Apex client in AMC that was intended to include purchases and sales, but, due to an error, only included substantial purchases." Pace Decl. Ex. 1, Dkt. 491-2 at 13. NSCC's projections continued to shift throughout the January 28, 2021 trading day, ultimately resulting in the NSCC eliminating its additional collateral requirement for Apex. Am. CAC ¶¶ 85–86. At approximately 2:55 p.m. Apex resumed accepting purchase orders from introducing brokers for the three Meme Stocks. Am. CAC ¶ 81.

Thus, customers whose introducing brokers cleared through Apex were able to trade the three stocks at issue (GME, AMC, and KOSS) at the open of trading and

at the end of the trading day on January 28, 2021. But Apex did not accept new buy orders for three stocks (GME, AMC, and KOSS)—for a total of approximately 3 hours and 25 minutes during the middle of the day.

## II. PROCEEDINGS BELOW

Various lawsuits against broker-dealers and securities market participants were consolidated in the multidistrict litigation captioned, *In re January 2021 Short Squeeze Trading Litigation* ("MDL"), No. 1:21-md-02989 (S.D. Fla. Apr. 1, 2021). The District Court divided the MDL claims into four tranches: the Antitrust Tranche, the Robinhood Tranche, the Other Broker Tranche, and the Securities Tranche. Order, Dkt. 310 at 1-2. The District Court ordered lead plaintiffs to file superseding complaints. *Id*. The District Court ordered Apex and the other defendants in the MDL to produce more than 20,000 pages of pre-complaint discovery to Plaintiffs and granted the MDL plaintiffs additional time to review those documents prior to filing consolidated complaints. Order, Dkt. 323 at 2 ¶ 6.[6]

Plaintiffs Jang and Chavez represent the Other Broker Tranche bringing state law claims against Apex. Apex is the sole defendant in the Other Broker Tranche. Plaintiffs have been given the opportunity to amend their complaints against Apex

---

[6] The operative complaints in the Antitrust, Robinhood, and Other Broker Tranches have all been dismissed with prejudice. *See* Order, Dkt. 470; Order, Dkt. 453; Order, Dkt. 525. The District Court's decision on the Robinhood Tranche is currently on appeal. *See* Dkt. 453; *Andrea Juncadella, et al. v. Robinhood Fin. LLC, et al.*, No. 22-10669 (11th Cir. Mar. 2, 2022), Dkt. 1-2.

on three occasions and have filed four complaints against Apex, including the final complaint which was dismissed with prejudice and is the subject of this appeal.

**The First Complaint.**  On July 27, 2021, Plaintiffs Jang and Chavez joined the MDL through the consolidation process by asserting their single negligence claim for the first time in their Consolidated Class Action Complaint.  Compl., Dkt. 359 (the "First Complaint").  Apex moved to dismiss the First Complaint, including for lack of personal and subject matter jurisdiction, and on the ground that Apex, as a clearing broker, did not owe to Plaintiffs any of the purported duties that Plaintiffs alleged.  Mot. to Dismiss, Dkt. 405.

**The Second Complaint.**  In response to Apex's motion to dismiss, Plaintiffs preemptively amended their complaint.  Am. Compl., Dkt. 410 (the "Second Complaint").  Plaintiffs' allegations remained largely unchanged in the Second Complaint, but added claims for breach of fiduciary duty and tortious interference. *Id*.  Apex moved to dismiss on the same grounds as those that Apex later would assert against Plaintiffs' final complaint.  Mot. to Dismiss, Dkt. 422.  The District Court granted Apex's motion to dismiss for lack of subject matter jurisdiction.  Order, Dkt. 450.  The District Court did not reach Apex's substantive arguments.  The District Court warned Plaintiffs that the next complaint they filed "would be their last" opportunity to amend their complaint. *Id.*

**The Third Complaint.** In the Third Complaint, Plaintiffs chose to largely repeat the allegations of their earlier complaints but filed it outside the MDL, the Southern District of New York. *Chavez et al v. Apex Clearing Corp.*, No. 1:22-cv-01233, (S.D.N.Y. Feb. 15, 2022), Dkt. 4 (the "Third Complaint"). That action promptly was transferred to the MDL over Plaintiffs' objection. Order, Dkt. 478 at 1–2. On its own motion, the District Court ordered Plaintiffs to amend their complaint to correct their deficient pleading as to the diversity of citizenship of the parties. Order, Dkt. 481 at 1–2.

**The Fourth Complaint.** In response to the District Court's order, Plaintiffs filed a fourth complaint that largely was identical to their third, except that Plaintiffs added an additional claim for breach of the implied duty of good faith and fair dealing and acknowledged the existence of Apex's customer agreement with Named Plaintiffs. Am. CAC, Dkt. 483 (the "Fourth Complaint," cited throughout as "Am. CAC"). When Plaintiffs were drafting the Fourth Complaint, Plaintiffs had the more than 20,000 pages of documents that had been turned over to government authorities from defendants in the MDL (including Apex), as well as the SEC Staff Report on the events of January 28, 2021, and Congressional testimony concerning the January 28, 2021. *E.g.*, Am. CAC ¶¶ 33, 38 (Bodson Testimony); *id.* at ¶¶ 66-67 (SEC Staff Report).

Apex moved to dismiss the Fourth Complaint on the same grounds on which it had moved to dismiss the Second Complaint—this was Apex's third time moving to dismiss these allegations.  Mot. to Dismiss, Dkt. 491.  The District Court dismissed Plaintiffs' claims with prejudice on January 9, 2023, and this appeal followed.

## III.    STANDARD OF REVIEW

The District Court's grant of Apex's motion to dismiss as to each of Plaintiffs claims is reviewed *de novo*.  *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys.*, 673 F. App'x 925, 927 (11th Cir. 2016).  However, the District Court's decision to dismiss Plaintiffs' claims with prejudice must be reviewed under the higher standard of abuse of discretion.  *Id.*

## <u>SUMMARY OF THE ARGUMENT</u>

Plaintiffs assert four claims against Apex in tort for doing what the parties' Customer Agreement and New York law permit Apex to do:  Refusing to accept new buy orders of Meme Stocks.  Plaintiffs' claims properly were dismissed:

*First*, Plaintiffs' claim for breach of fiduciary duty (Count II) fails because Apex owed no fiduciary duty to Plaintiffs.  Under well-settled New York law, clearing brokers do not owe fiduciary duties to introduced customers.  The only exception has been found by New York courts to exist only where a clearing broker strayed so far outside its ministerial duties that it became an active and knowing

participant in an introducing broker's fraud.  Plaintiffs allege no fraud.  (*See* Section I.A.)

*Second*, Plaintiffs' claim for negligence (Count I) fails because New York courts repeatedly have held that clearing brokers do not owe a general duty of care to customers of the introducing brokers (i.e., individual investors).  And the specific duties Plaintiffs seek to create here—including a duty to accept all trades—are contrary to settled New York broker-dealer tort law and to the Customer Agreement Plaintiffs signed.  Plaintiffs' claim is independently barred by the economic loss doctrine, which prevents actions in negligence for purely economic damages absent a special relationship—particularly where the claim is governed by contract—and no such relationship is plausibly alleged here.  (*See* Section I.B.)

*Third*, Plaintiffs' claim for breach of the implied duty of good faith and fair dealing (Count III) fails because it directly conflicts with the express terms of Paragraph 3 of the Customer Agreement, which gives Apex the right to refuse to accept trades "at any time" and "for any reason."  New York law does not permit the implied duty of good faith and fair dealing to supplant the express terms of the contract.  (*See* Section I.C.)

*Fourth*, Plaintiffs' claim for tortious interference with economic relations fails because Plaintiffs have failed to allege the requisite "wrongful conduct" required by New York law.  Plaintiffs ask this Court to create an "egregious conduct" exception

to the "wrongful conduct" element, but the New York Court of Appeals decision on which Plaintiffs rely specifically held that it was not creating such an exception.  (*See* Section II.)

*Fifth*, the District Court did not abuse its discretion in granting Apex's motion to dismiss with prejudice and denying Plaintiffs leave to amend.  (*See* Section III.)

## **ARGUMENT**

This is a case about a clearing broker's ability under New York law to manage risk by rejecting trades.  Plaintiffs are two individuals who held shares of Meme Stocks in their trading accounts with web-based brokers Webull and Ally and sold those shares at a time of unprecedented volatility.  Apex performs back-office clearing functions for introducing brokers Webull and Ally.  Though "ministerial" in nature, Apex's clearing services are far from trivial and are laden with risk.  When an investor places an order through her introducing broker, it takes two days (T+2) for the transaction to "clear"—that is for the cash and securities to be delivered.  In that time, Apex bears the risk of default on either side of the transaction.  So, as a condition of their use of Apex's clearing services, Plaintiffs Jang and Chavez signed a Customer Agreement with Apex (Br. 6, 50) that gave Apex the right to refuse to accept trades at any time and for any reason.  To avoid the terms of the agreement they signed, Plaintiffs now argue that Apex is liable in tort for its decision temporarily to reject purchase orders for three Meme Stocks.

Plaintiffs ask this Court, sitting in diversity, to create a new duty under New York law that no court before has recognized, under which, clearing brokers would be required to accept *all* new trades, even in times of extreme market volatility. Each claim fails for the same reason: Apex owed Plaintiffs no duty to accept new trades. New York law consistently has endorsed the right of a broker to reject trades for more than six decades. *See Busch v. L.F. Rothschild*, 23 A.D.2d 189, 190 (1st Dep't 1965). And Apex's "Three Way" Contract (Br. 50) with Plaintiffs expressly reserved this right to reject trades "for any reason." Customer Agreement, Dkt. 491-3 ¶ 3. This Court should affirm the District Court's well-reasoned opinion in full.

## I. THE DISTRICT COURT CORRECTLY DECLINED TO CREATE THE NOVEL COMMON LAW DUTIES PLAINTIFFS SEEK TO CREATE HERE

Plaintiffs concede that New York law governs. Br. 5, 19. But Plaintiffs ask this Court, sitting in a case premised on diversity jurisdiction, to invent duties for clearing brokers under New York common law that New York courts consistently have rejected for many decades. *See Salinero v. Johnson & Johnson*, 995 F.3d 959, 968 (11th Cir. 2021) ("Without some indication that [the state] intends to recognize so significant a change in the law, a federal court sitting in diversity ought not to do so."). The District Court was correct in rejecting Plaintiffs' arguments.

Throughout their brief, Plaintiffs attempt to muddy the water by referring obliquely to Apex as a "broker-dealer" and then selectively quoting cases that use that same term to describe duties owed by other types of broker-dealers that have

fiduciary responsibilities. *See, e.g.*, Br. 23–24, 28–30. However, the broad term "broker-dealer" can be used to describe *introducing* brokers (e.g., retail, non-discretionary broker-dealers and discretionary broker-dealers) as well as *clearing* brokers. Each plays a distinct role in the securities markets, has varying degrees of contact with individual investors, and, most importantly, has varying duties under New York common law. *See generally* 2 James A. Fanto, Jill I. Gross & Norman S. Poser, BROKER-DEALER LAW AND REGULATION § 15.05 (Fifth Edition, 2023-2 Supp. 2018).

As to Plaintiffs Jang and Chavez, Apex was solely a clearing broker. Am. CAC ¶¶ 14, 18. Plaintiffs admit that Webull and Ally were their introducing brokers. *See* Am. CAC ¶ 14 ("Plaintiff Chavez is an investor who used Webull Financial LLC ('Webull') as his introducing broker-dealer and Apex as his clearing broker."); Am. CAC ¶ 18 ("Plaintiff Jang is an investor who used Ally Invest Securities ('Ally') as his introducing broker-dealer and Apex as his clearing broker.").

This Court may consider only Apex's relationship with the Named Plaintiffs as their clearing broker, and not any other putative class member's relationship. *See Alwert v. Cox Communs., Inc. (In re Cox Enters., Inc. Set-Top Cable TV Box Antitrust Litig.)*, 835 F.3d 1195, 1203 (10th Cir. 2016) ("But prospective plaintiffs—that is, unnamed members of a putative class—are not parties to class litigation."); Op. 22 n.10, 28 n.14.

Plaintiffs' claims here fail under well-established New York law holding that (a) clearing brokers like Apex do not have any fiduciary duty to investors, (b) broker-dealers always have the legal right to decline to open a new position with an investor under New York law, (c) clearing brokers have no duty to protect investors from economic losses and thus cannot be held negligent in any failure to do so, and (d) the implied duty of good faith and fair dealing cannot rewrite Paragraph 3 of the Customer Agreement to remove Apex's express contractual right with Plaintiffs to "refuse to execute securities transactions for the Customer *at any time* and *for any reason*." Customer Agreement, Dkt. 491-3 at ¶ 3 (emphasis added).

## A. Apex, as Plaintiffs' Clearing Broker, Owes No Fiduciary Duty to Plaintiffs

Plaintiffs allege that (1) as a "broker-dealer" Apex owed Named Plaintiffs fiduciary duties, and (2) this duty included accepting all trades no matter what. Am. CAC ¶¶ 115–16, 107–08; Br. 23–27, 32, 42–46.

This argument fails. New York courts repeatedly have held that clearing brokers owe no fiduciary duties to introduced customers, that is, customers of the introducing brokers. And this Circuit recognized that rule more than two decades ago, holding that "clearing firms have no fiduciary relationship with the customers of introducing brokers." *Strategic Income Fund, L.L.C. v. Spear, Leeds & Kellogg Corp.*, 305 F.3d 1293, 1296 n.12 (11th Cir. 2002) (quoting *Connolly v. Havens*, 763 F. Supp. 6, 10 (S.D.N.Y. 1991)). Plaintiffs do not cite (*e.g.*, Br. 23–27, 42–46) a

single case that supports Plaintiffs' indefinite proposed duty for a clearing broker to protect the value of an introducing customer's stock price after a trade closes. Nor is there any support for a clearing broker duty to accept any and all trades—no matter what.

### 1. Apex as a Clearing Broker Owed No Fiduciary Duties to the Introduced Customers Here

"New York courts have held that clearing brokers generally have no fiduciary duty to individual investors." *Rozsa v. May Davis Grp., Inc.*, 152 F. Supp. 2d 526, 531 (S.D.N.Y. 2001) (holding no fiduciary duty owed where complaint failed to allege defendant "acted as anything other than a generic clearing agent").

The support for this proposition is legion. *See, e.g.*, *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d 454, 465–66 (2d Cir. 2013) ("We have previously said that [under New York law] a clearing agent is generally under no fiduciary duty to the owners of the securities that pass through its hands") (citing *Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 484 (2d Cir. 1979)) (internal quotations omitted); *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991) ("A fiduciary relationship exists under New York law when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation … No such relationship existed between BBSI, the clearing agent, and Flickinger, the investor.") (citations omitted); *Ross v. Bolton*, 904 F.2d 819, 826 (2d Cir. 1990) (no fiduciary duty where clearing agent did not open the

customer account or have "any relationship with investors other than collecting funds"); *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478, 484 ("[A] clearing agent[] is generally under no fiduciary duty to the owners of securities that pass through its hands."); *McDaniel v. Bear Stearns & Co.*, 196 F. Supp. 2d 343, 352 (S.D.N.Y. 2002) ("It is well-settled that, when a clearing firm acts merely as a clearing agent, it owes no fiduciary duty to the customers of its introducing broker and cannot be held liable to the acts of an introducing firm;" collecting cases); *Connolly v. Havens*, 763 F. Supp. 6 at 10 ("It is well-established that a clearing firm, such as SSC, does not have a fiduciary relationship with the customers—such as plaintiffs herein—of the introducing broker with which it has contracted to perform clearing services.") (collecting cases).

For more than 20 years, this Circuit has recognized this unbroken line of New York case law holding the absence of any duty owed by clearing brokers to customers. *See Spear, Leeds & Kellogg Corp.*, 305 F.3d at 1296 n.12 (affirming dismissal of complaint and denial of leave to amend a third amended complaint, noting that "counsel was certainly mindful of the general rule that clearing firms have no fiduciary relationship with the customers of introducing brokers," and quoting *Connolly v. Havens*, 763 F. Supp. 6, 10 (S.D.N.Y. 1991): "It is well-established that a clearing firm … does not have a fiduciary relationship with the customers … of the introducing broker with which it has contracting to perform

clearing.") (ellipses in original)); *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1335, 1338–39 (11th Cir. 2010) (affirming dismissal with prejudice of plaintiff investor complaint for breach of fiduciary duty and constructive fraud in "one of the largest securities fraud cases in Florida history;" "clearing brokers ordinarily owe no fiduciary duty to the customers of introducing brokers" (citing *Spear, Leeds & Kellogg Corp.*, 305 F.3d at 1296 n.12); "the fiduciary is the party who has direct contact with and provides investment advice to the customer") (citing *McDaniel*, 196 F. Supp. 2d at 353).

Because Plaintiffs admit that Apex was nothing more than their clearing broker (Am. CAC ¶¶ 14, 18; Br. 5-6), Apex thus owed Plaintiffs no fiduciary duties, and Plaintiffs' claim for breach of fiduciary duty fails.

### 2. Even Introducing Brokers, and Broker-Dealers Generally, Have No Duty to Accept Trades Under Longstanding New York Law (*Busch*)

Plaintiffs misstate New York law (Br. 42–43) when they assert that Apex, because it provides financial services and also is a "broker-dealer," had a fiduciary duty to Plaintiffs to accept new buy orders indefinitely.[7]

---

[7] *Compare* Br. 43 (asserting that "Under New York law the nature of the relationship between stockbroker and investor/customer is a fiduciary relationship.") *with DeBlasio v. Merrill Lynch & Co.*, 2009 U.S. Dist. LEXIS 64848, at *89 (S.D.N.Y. July 27, 2009) ("under New York law, the 'mere existence of a broker-customer relationship is not proof of its fiduciary character.'").

It has been the clear law of New York for over 60 years that a broker (introducing or otherwise) has no duty to accept new orders. A broker is free under New York law to reject the customer's order. The seminal case is *Busch v. L.F. Rothschild*, 23 A.D.2d 189 (1st Dep't 1965). There, the five judges of the New York Appellate Division, First Department considered the case of broker Rothschild having received two orders from plaintiff Busch: (1) sell 50 Rapid American bonds, and (2) sell 300 shares of International Paper. The stockbroker accepted the order to sell the International Paper shares, but "refused flatly to accept the order to sell the bonds." *Id.* at 189. The *Busch* court held that, "Unless he [the broker] accepts the agency he has *no duty to execute any order* and may refuse to do so (1 Meyer, LAW OF STOCK BROKERS AND STOCK EXCHANGES, [1931] p.249)." *Id.* at 190 (emphasis added).

The *Busch* court relied on two earlier decisions, including the New York Court of Appeals decision in *Le Marchant v. Moore*, 150 N.Y. 209, 215 (1896) (plaintiffs "ordered Evans & Company, their bankers [and brokers] in Boston, to purchase the stock in question. Evans & Company might have refused compliance with that order. Had they done so, that would have been an end of the transaction"). *Busch* held that the only obligation of any stockbroker in rejecting an order is that the refusal be communicated in a timely fashion—which, as here, was not at issue. *Busch*, at 190 ("Concededly it [the purchase restriction] was immediate.").

Concluding, the *Busch* court held: "A broker is not obligated to accept an order of a customer for execution … ." *Busch*, at 190. *Busch* also relied on the U.S. Supreme Court decision in *Galigher v. Jones*, 129 U.S. 193, 198 (1889), which stressed the importance of a broker notifying its customer before refusing to accept a trade. *Galigher*, 129 U.S. at 198 ("A broker is but an agent, and is bound to follow the directions of his principal, *or give notice that he declines to continue the agency.* … The plaintiff should have given prompt notice that he objected and declined to make the change.") (holding delay caused by mail alone "inexcusable" notice failure where telegraphic communication was available). *Busch*, in an explanatory discussion of this case and partially quoting the above, goes on to conclude that: "It would follow [in *Galigher*] that had prompt notice been given there would have been no liability." *Busch*, 23 A.D.2d at 190. There is no dispute that notice was given here, despite Plaintiffs chiding Apex for doing so. Br. 13, 31; Am. CAC ¶¶ 2, 29.

The rule stated in *Busch* has been followed in an unbroken line of cases. *See Courtland v. Walston & Co.*, 340 F. Supp. 1076, 1079–80 (S.D.N.Y. 1972) (broker refused customer order to purchase 100 shares of GM stock and 100 shares of Xerox stock: "*[I]n refusing to make the purchases for her account they [defendants] acted within their rights.* … A stockbroker need not accept the orders of a customer so long as he makes clear at the time the orders are given that he refuses to perform them.") (emphasis added) (citing *Busch*, 23 A.D.2d at 259); *Hand v. Dean Witter*

*Reynolds, Inc.*, 889 S.W.2d 483 (Tex. Ct. App. 1994) (citing e.g., *Courtland*, *Busch*, and *Galigher*: "Generally, while a broker has a duty to execute a customer's order to liquidate existing positions, he has no duty to accept an order to open new positions unless he accepts the agency. The only duty that arises, if a broker refuses to accept the agency, is that the broker must give prompt notice that the order is refused." (other citation omitted)); *French v. Bache Halsey Stuart Inc.*, Comm. Fut. L. Rep. ¶ 20,444 at *11 (CFTC 1977) ("It seems well settled that there is no absolute duty on the part of a broker to execute trades for a customer"; quoting *Galigher* and *Busch* on the proper notice for a broker's refusal of a trade); *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999) (citing *Busch* favorably on stockbroker obligation); *Moran v. Kidder Peabody & Co.*, 617 F. Supp. 1065, 1068 (S.D.N.Y. 1985) (citing *Busch* on stockbroker obligation). *See also Capital Options Invest., Inc. v. Goldberg Bros. Commodities, Inc.*, 1990 U.S. Dist. LEXIS 14736, at *20 (N.D. Ill. Oct. 24, 1990) (relying on *French*, Comm. Fut. L. Rep. ¶ 20,444: "Neither does Capital [the customer] have a claim against Linnco [broker] for refusing to accept Capital's orders for new positions. A broker generally has a duty to accept customer orders to liquidate existing positions, but has no duty to accept customer orders for new positions."; investor claim rejected), *aff'd,* 958 F.2d 186 (7th Cir. 1992).

As a result, the rule for brokers generally is that the agency relationship for introducing brokers is transaction-by-transaction, so that the broker-dealer is free to reject the next trade. As the Second Circuit has noted that for broker-dealers generally, "[t]he broker's duties ordinarily end after each transaction is done … ." *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002). *See also* 2 James A. Fanto, Jill I. Gross & Norman S. Poser, Broker-Dealer Law and Regulation § 15.02 (Fifth Ed., 2023-2 Supp. 2018) ("Normally the agency relationship created by a non-discretionary account arises when the client places an order and terminates when the transaction ordered is complete … .").

In short, nothing about broker-dealer law generally creates the duty that plaintiffs seek to impose here.

### 3. Apex Clearing's Customer Agreement Granted Apex the Right to Refuse Trades "At Any Time And For Any Reason"

It is commonplace, as the SEC has noted, for broker-dealers to include contractual provisions that make clear broker-dealers retain the right to decline trades:

> [B]roker-dealers may reserve the ability to reject or limit customer transactions. This may be done for legal, compliance, or risk management reasons, and is typically discussed in the customer account agreement. In certain circumstances, broker-dealers may determine not to accept orders where a transaction presents certain associated compliance or legal risks.

U.S. Securities and Exchange Commission, Investor Alerts and Bulletins, *Thinking About Investing in the Latest Hot Stock?: Understand the Significant Risks of Short-Term Trading Based on Social Media* (Jan. 30, 2021), available at https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert (emphasis added) (cited in Mot. to Dismiss, Dkt. 491 at 2 n.1) (hereinafter "SEC Jan. 30, 2021 Investor Bulletin"); SEC Staff Report, Dkt. 494-2, at 32 ("In their customer account agreements, some broker-dealers reserve the right to decline customer orders . . . Such actions could be taken, for example for legal, compliance, or risk management reasons.")

Apex's Customer Agreement, termed the "Three Way" Broker Agreement by Plaintiffs (Br. 50, 6), included exactly such a provision as described in the SEC Bulletin.  Customer Agreement, Dkt. 491-3 ¶ 3.

Paragraph 3 of the Customer Agreement explicitly gives Apex an absolute "***right to refuse*** to execute securities transactions" for customers "***at any time and for any reason.***"  Customer Agreement, Dkt. 491-3 ¶ 3 ("You [Apex Clearing] have the right to refuse to execute securities transactions for the Customer at any time and for any reason.") (emphasis added).  And Plaintiffs make no allegations to avoid this term; there is no allegation that the Customer Agreement arose from fraud in the inducement, a mistake, or was a contract of adhesion.

The very existence of the binding Customer Agreement precludes Plaintiffs' novel fiduciary duty theory. As the New York Court of Appeals has made clear, "there is no reason why an appeal to general fiduciary law should be used as a pretext for evading contractual obligations." *Ingle v. Glamore Motor Sales, Inc.*, 73 N.Y.2d 183, 190 (1989) (holding no protection in fiduciary duty law where contract expressly permitted action at issue) (citations and internal quotations omitted).

The Customer Agreement explicitly disclaims any fiduciary relationship. Customer Agreement, Dkt. 491-3 ¶ 6 ("The Customer represents that the Customer understands that you [Apex] act only to clear trades introduced by the Customer's Introducing Broker and to effect other back office functions … The Customer confirms to you [Apex] that the Customer is relying for any advice concerning the Customer's accounts solely on the Customer's Introducing Broker."); *id.* ("[T]he Customer will in no way hold you liable for any trading losses that the Customer may incur. … The Customer understands that you will not review the Customer's accounts and will have no responsibility for trades made in the Customer's accounts."). This court has previously enforced such restrictions. *See SFM Holdings*, 600 F.3d at 1337–41; *see id.* at 1339 ("The PB Agreement explicitly stated the Banc of America Securities was not acting as an advisor or fiduciary to the customer."; the parties' relationship "is determined by the substantive agreement of the parties").

To attempt to overcome insurmountable New York precedent and to avoid the unequivocal language of their Customer Agreement with Apex, Plaintiffs cite to the Second Circuit's *Conway* opinion to argue that a stockbroker is an investor's fiduciary, and so Apex owed Jang and Chavez fiduciary duties to accept new buy orders and safeguard the value of Plaintiffs' Meme Stocks. Br. 43 (citing *Conway v. Icahn & Co.*, 16 F.3d 504, 510 (2d. Cir. 1994)). Contrary to Plaintiffs' suggestion, *Conway* addressed liability of a *nondiscretionary broker* (i.e., an *introducing* broker who does not have the right to trade without the client's consent) for liquidating his client's account without his client's consent. *Conway*, 16 F.3d at 506, 509. And *Conway* acknowledged the distinction between the duties that nondiscretionary introducing brokers owe clients and the duties of clearing brokers owe introduced customers:

> Although Icahn [the non-discretionary broker] argues here that Cowen [the clearing broker] would have executed the liquidation if it did not, the fact remains that Icahn, *having very different duties toward Conway* [the introduced customer], actually chose the stocks and sold them.

*Conway*, 16 F.3d at 509 (emphasis added).

The Second Circuit in *de Kwiatowski*—a case Plaintiffs also mischaracterize (Br. 43–44)—distinguished *Conway* similarly. *de Kwiatkowski*, 306 F.3d at 1306 (explaining that, even though a nondiscretionary introducing broker may be held liable for taking "unauthorized measures concerning the customer's account," as in

*Conway*, such a broker owes no *ongoing* duty that extends beyond the execution of the securities transaction); *id.* at 1311. Simply put, New York courts have made it abundantly clear that the mere invocation of the term "broker-dealer" does not establish the existence of fiduciary duties or any ongoing duty to accept *future* trades.

The repeated incantation by Plaintiffs of a "one-sided Market Suspension" (Br. 2, 13, 15, 16, 19, 20, 22, 27, 32) cannot conjure up a duty on Apex's part. Plaintiffs' novel label apparently refers to Apex refusing to accept buy orders for the three meme stocks, but accepting sell orders during the mid-day suspension of those buy orders. Br. 13. Despite these repeated references, Plaintiffs muster no case law. Instead, the law in New York is directly contrary: the rule for brokers generally is that the agency is transaction-specific, based on leading cases where the broker accepted one trade and denied another. *E.g.*, *Busch*, 23 A.D.2d at 189 (accepted the sell order for International Paper stock, rejected the sell order for Rapid American bonds); *see also de Kwiatkowski*, 306 F.3d at 1302 ("The broker's duties ordinarily end after each transaction is done … ."); *id.* at 1311 (plaintiff investor's claim of an "ongoing duty" of "due care" "cannot be squared with the cases holding that a broker's obligations to a nondiscretionary client arise and are satisfied transaction-by-transaction"); *Capital Options*, 1990 U.S. Dist. LEXIS 14736, at *20 ("A broker generally has a duty to liquidate existing positions, but has no duty to accept customer orders for new positions"; no liability found where broker accepted sell

orders but refuse orders to buy new positions); *French*, Comm. Fut. L. Rep. ¶ 20,444 at *13 ("the execution of new contracts exposes the broker … to new financial risks. … [T]he right to refuse a liquidation order is more limited"). The Customer Agreement here grants full discretion to Apex to refuse any trade at any time for any reason. Customer Agreement, Dkt. 491-3 ¶ 3.

4. **Plaintiffs Do Not Plead Facts that Would Establish that Apex Falls within the Narrow Liability Exception for Clearing Brokers Who Participate in Introducing Brokers' Fraud**

In an effort to avoid dismissal, Plaintiffs resort to citing securities fraud actions—different in kind from any conduct alleged here—in which New York courts have held that if, in "extenuating circumstances" a clearing broker became so involved in the introducing broker's fraudulent conduct, then a court may impose upon the clearing broker a duty to disclose the introducing broker's fraud. But this rare exception has nothing to do with this case.

First, each and every case Plaintiffs cite for this exception involved allegations of a clearing broker's participation in *fraud* by the *introducing* broker, and there is no pleading of fraud here. *See* Br. 45–49, citing *McDaniel v. Bear Stearns & Co.*, 196 F. Supp. 2d 343, 353 (S.D.N.Y. 2002) (aiding and abetting fraud); *Glob. Enter. Grp. Holding, S.A. v. Ottimo*, 2010 U.S. Dist. LEXIS 145126, at *16-17 (E.D.N.Y. June 8, 2010) (finding no fiduciary duty where clearing broker "lacked actual knowledge of the fraud"); *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 2002 WL

88226, at *3 (S.D.N.Y. Jan. 23, 2002) (denying summary judgment on clearing broker aiding and abetting fraud where alleged that clearing broker knew of fraud and actively participated in it); *In re Blech Sec. Litig.*, 961 F. Supp. 569, 584 (S.D.N.Y. 1997) (fraud); *Goldman v. McMahan, Brafman, Morgan & Co.*, 1987 U.S. Dist. LEXIS 5356, at *22 (S.D.N.Y. 1987) (fraud); *Scone Invs., L.P. v. Am. Third Mkt. Corp.*, 1998 U.S. Dist. LEXIS 5903, at *25 (S.D.N.Y. Apr. 27, 1998) (recognizing, but declining to apply, exception for clearing broker's "direct[] engage[ment] in the fraudulent conduct at issue" in context of a mortgage lender); *Rozsa v. May Davis Grp., Inc.*, 152 F. Supp. 2d 526, 531–32 (S.D.N.Y. 2001) (noting, but declining to apply, "extenuating circumstances" exception under *Goldman* for active participation in fraudulent conduct of introducing broker).[8]

Plaintiffs make no allegations of participation in a fraudulent scheme, *see generally* Am. CAC, and therefore fail to plead the required "extenuating circumstances." *See Cromer Fin. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) (applying New York law: "A clearing broker does not provide 'substantial assistance' to or 'participate' in a fraud when it merely clears trades."). The words "fraud" and "fraudulent" do not even appear in the Plaintiffs' fourth complaint.

---

[8] Plaintiffs also cite *Overstock.com, Inc. v. Goldman Sachs & Co.*, to support their "extenuating circumstances" argument (Br. 45–46), but *Overstock* addressed clearing broker liability under California fraud statutes not at issue here. 231 Cal. App. 4th 513, 546 (Cal. 1st App. 2014).

In the absence of plausible allegations of fraud, New York federal courts have expressly declined to hold that a clearing broker has any fiduciary obligations to introduced customers—even where the clearing broker takes actions beyond its strictly ministerial duties. In *Dercole v. Divico Fin. of Am.*, the District Court stated:

> A holding that clearing firms incur fiduciary obligations every time they act beyond the scope of their limited role of processing trades and maintaining records would place such firms in an untenable position.

2005 U.S. Dist. LEXIS 59757, at *11 (E.D.N.Y. Dec. 20, 2005). The *Dercole* court recognized that the rulings in cases concluding that extenuating circumstances were present "were predicated … on factual allegations that the clearing firm was 'actively engaged' in, or had 'knowledge' of, the fraudulent activities of the introducing broker." *Id.* at *10–11 (internal citations omitted).

Second, even if this Court were to conclude, contrary to New York law, that "extenuating circumstances" could exist outside of the fraud context, Plaintiffs failed to allege that Apex engaged in actions beyond its ministerial duties. Br. 46–47. "[E]xtenuating circumstances" cannot be established by conduct specifically permitted by the parties' contract. *Levitt v. J.P. Morgan Sec., Inc.*, 710 F.3d at 467–68 (no clearing broker duty to investor despite "unusual" actions, possible regulatory violations).

Here, Apex's temporary refusal to accept new purchase orders of three Meme Stocks was permitted by Plaintiffs' contract with Apex. Customer Agreement, Dkt.

491-3 ¶ 3 (Apex has the right to "refuse to execute securities transactions for the Customer at any time and for any reason"). This right to reject trades is a vital contractual provision that protects Apex against the risk of investor default, which risk Apex must bear. Henry F. Minnerop, *The Role and Regulation of Clearing Brokers*, 48 BUS LAW. 841, 844 (1992) ("Each transaction exposes the clearing firm to the risk that the customer may not pay"); SEC Jan. 30, 2021 Investor Bulletin (broker-dealers "may reserve the ability to reject or limit customer transactions" for "risk management reasons"); *Capital Options*, 1990 U.S. Dist. LEXIS 14736, at *15-*18.

Third, contrary to Plaintiffs' suggestion (Br. 34–35, 45–47), by notifying introduced brokers that Apex was suspending *its own* acceptance of orders for three stocks, Apex was not "actively and directly involved in the introductory broker's actions." *See McDaniel*, 196 F. Supp. 2d at 353. Apex had no choice but to inform the introducing brokers of its decision. *Busch*, 23 A.D.2d at 190 (broker gave notice of non-acceptance of bonds order); *Galigher*, 129 U.S. at 198 (failure to give timely notice of non-acceptance of customer order created liability). And introducing brokers then of course needed to inform their own customers—i.e., that they would no longer accept such orders. Notice gave customers the option to buy the stock elsewhere. Br. 13–14, n.9 (admitting other brokerage firms were available).

The cases of clearing brokers becoming liable as introducing brokers involves vastly different situations, such as the clearing broker assuming the staffing of the introducing broker's operation, *see, e.g.*, *Berwecky v. Bear, Stearns & Co.*, 197 F.R.D. 65, 67 (S.D.N.Y. 2000) (clearing broker asserted "control" over introducing broker's operations by "placing [clearing broker]'s employees at [introducing broker's] offices" to oversee fraudulent scheme), or where the clearing broker joins a fraud of the introducing broker, *see In re Blech Sec. Litig.*, 961 F. Supp. at 585 (clearing broker "alleged to have conceived of and participated in the initiation and clearing of sham transactions aimed at affecting the … price of the Blech Securities"); *Goldman*, 1987 U.S. Dist. LEXIS 5356, at *66 (clearing broker "actively engaged with MBM's general partners in creating fraudulent trading losses"). Plaintiffs do not allege Apex did either. Plaintiffs' repeated characterization of Apex's actions as "unilateral" (Br. 13: "Apex unilaterally blocked"; Br. 16; Am. CAC ¶2 ("Apex unilaterally and abruptly blocked") belie any collusion with introduced brokers.

> ### 5. This Court Should Reject Plaintiffs' Novel Argument that Apex, Having Provided Clearing Services for the Purchase of Plaintiffs' Meme Stocks, Then Had a Never-Ending Duty to Protect the Value of Those Stocks

Plaintiffs argue—citing *de Kwiatkowski*—that because Apex provided clearing broker services for Plaintiffs' *purchase* of the Meme Stocks, Apex had a never-ending duty not to take subsequent actions that could negatively impact the

value of those Meme Stocks for as long as Plaintiffs held the stocks.  Br. 27

("safeguarding the investments of Plaintiffs"), 42-45, 51; Am. CAC ¶ 108.

But Plaintiffs' argument was flatly rejected by the Second Circuit in *de Kwiatkowski*.  The Second Circuit specifically **disavowed** the existence of any ongoing duty of a nondiscretionary broker beyond "*executing* the client's trade orders":

> The broker's duties ordinarily *end after each transaction is done*, and thus do not include a duty to offer unsolicited information, advice, or warnings concerning the customer's investments. …   On a *transaction-by-transaction basis*, the broker owes duties of diligence and competence in *executing the client's trade orders*, and is obliged to give honest and complete information when recommending a purchase or sale.  The client may enjoy the broker's advice and recommendations with respect to a given trade, but has **no legal claim on the broker's ongoing attention**.

*de Kwiatkowski*, 306 F.3d at 1302 (emphasis added); *see also Clarex Ltd. v. Natixis Sec. Am. LLC*, 2013 U.S. Dist. LEXIS 82632, at *14–15 (S.D.N.Y. June 11, 2013) ("With respect to a customer on a nondiscretionary account, a broker has 'narrowly defined duties that begin and end with each transaction.'") (internal citations omitted).  Plaintiffs' proposed duty stands *de Kwiatkowski* on its head, and—given the thousands or millions of transactions entered each day—would lead to contradictory duties that no clearing broker could ever meet.  Courts reject such duties to monitor investments even for introducing brokers.  *See de Kwiatkowski*,

306 F.3d at 1311 ("[T]here is no basis in this case for a more comprehensive duty on Bear's part to monitor Kwiatkowski's account between transactions.").

Moreover, the Apex Customer Agreement is crystal clear that Apex had no duty to monitor Plaintiffs' investments or to be concerned with how well Plaintiffs investments were faring. In Paragraph 6, the Agreement clearly provides: the Customer "understands that you [Apex] act only to clear trades. … and to effect other back office functions for the Customer's introducing broker. … the Customer is relying for any advice concerning the Customer's accounts solely on the Customer's Introducing Broker … the Customer will in no way hold you liable for any trading losses that the Customer may incur." Customer Agreement, Dkt. 491-3 ¶ 6. The Apex Customer Agreement must be enforced according to its terms as this Circuit has done in past clearing broker cases brought by investors. *See, e.g.*, *SFM Holding*, 600 F.3d at 1337–41.

Nor can Plaintiffs rely on the fact that Judge Altonaga, in a securities case involving Robinhood, interpreted "transaction" broadly in the context of market manipulation under Section 9(a) of the Securities Exchange Act of 1934. Br. 44. Plaintiffs have not brought a market manipulation claim against Apex ("market manipulation" appears nowhere in the complaint)—nor could they—and the Securities Exchange Act's broad use of a term hardly in that context can hardly create a broad new duty in an entirely different context. And even in that context,

"transaction" means a single purchase, sale, etc.—not all transactions an investor might make, and (in any event) not a purchase restriction. *See, e.g.*, *de Kwiatkowski*, 306 F.3d at 1302 ("[T]he broker's duties ordinarily end after each transaction is done … ."); *Clarex Ltd. v. Natixis Sec. Am. LLC*, 2013 U.S. Dist. LEXIS 82632, at *14–15 ("With respect to a customer on a nondiscretionary account, a broker has 'narrowly defined duties that begin and end with each transaction.'") (internal citations omitted); Order, Dkt. 503 at 17 ("[C]ourts have concluded that a 'transaction' encompasses 'not only completed purchases *or* sales but also bids and orders to purchase *or* sell securities.'") (emphasis added).

### B. Apex Owes No Duty to Named Plaintiffs under New York Negligence Law

Turning next to Plaintiffs' negligence claim (Count I), Plaintiffs argue that Apex owed Plaintiffs a general duty of care, which encompassed three duties derivative of Plaintiffs' proposed duty to accept all trades: (1) a duty to "ensure that the trading platforms it provide[s] and/or support[s are] sufficiently equipped to reliably deliver such services," Am. CAC ¶ 107; Br. 27, (2) a duty of "reasonable care in safeguarding the investments of Plaintiffs," Am. CAC ¶ 108; Br. 27, and (3) a duty to abide by FINRA regulations that impose a "responsibility for fair dealing" that persists "even during times of market stress." Am. CAC ¶ 44. This Court should decline to create these duties because New York law is settled that clearing brokers

do not owe introduced customers a general duty of care. Plaintiffs' negligence claim

also fails because it is barred by the economic loss doctrine.

### 1. As a Clearing Broker, Apex Owes Named Plaintiffs No General Duty of Care

Under New York law, "[t]he threshold question in any negligence action is:

does defendant owe a legally recognized duty of care to plaintiff?" *Hamilton v.*

*Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (2001).[9] Even introducing brokers

generally do not owe a duty to be a "reasonable broker beyond individual

transactions." *de Kwiatkowski*, 306 F.3d at 1311 ("[T]he assertion that Bear had an

ongoing duty to exercise 'due care' or 'behave like a reasonable broker' … cannot

be squared with the cases holding that a broker's obligations to a nondiscretionary

client arise and are satisfied transaction-by-transaction.").

New York courts have spoken clearly on the issue of whether clearing brokers

owe a duty of care to the customers of their introducing brokers, and they have

concluded that no such duty exists. *Greenfield v. Tassinari*, 8 A.D.3d 529, 530–31

(2d Dep't 2004) ("Since clearing brokers generally do not owe a fiduciary duty to

---

[9] Claiming the existence of a general duty to society is insufficient: "The injured party must show that a defendant owed not merely a general duty to society but a specific duty to him or her, for 'without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm.'" *Hamilton*, 96 N.Y.2d at 232 (2001). "This restriction is necessary to avoid exposing defendants to unlimited liability to an indeterminate class of persons conceivably injured by any negligence in a defendant's act." *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 289 (2001).

the customers of an introducing broker, the plaintiffs failed to state a negligence cause of action against these defendants.") (internal citations omitted); *Schwarz v. Bear Stearns Cos., Inc.*, 266 A.D.2d 133 (1st Dep't 1999) ("[D]efendants, as clearing brokers, had no duty to disclose to the introducing broker's clients, and thus the statutory cause of action, as well as the negligence claim, was properly dismissed."). Federal courts applying New York law agree. *See Rozsa v. May Davis Grp., Inc.*, 187 F. Supp. 2d 123, 131 (S.D.N.Y. 2002) (dismissing negligence claim and holding that "clearing brokers do not owe duties to plaintiffs who are customers of their introducing brokers"); *McDaniel*, 196 F. Supp. 2d at 355 (dismissing negligence claim against a defendant clearing broker, noting that "it has been determined that, 'as a matter of law, a clearing broker owes no duty of disclosure to the clients of an introducing broker.'") (quoting *Schwarz v. Bear Stearns & Co.*, 1998 N.Y. Misc. LEXIS 751, at *4 (N.Y. Sup. Ct. Aug. 24, 1998)). This Court, sitting in diversity, should not diverge from that well-settled New York precedent.

## 2. The Specific Duties Plaintiffs Seek to Create Have No Basis in Law

The specific duties that Plaintiffs ask this Court to create are duties unknown to New York law. First, Plaintiffs argue that Apex owed a general duty to Plaintiffs to ensure its clearing services were constantly available for their use, Br. 25–27; Am. CAC ¶ 107, even in the face of record trading volumes, SEC Staff Report, Dkt. 494-2 at 31. Next, Plaintiffs argue that Apex owed them a duty to safeguard their

investments. Br. 1, 27, 42–44; Op. 31; Am. CAC ¶ 108. And last, Plaintiffs argue that Apex owed them a duty to abide by FINRA regulations. Br. 8–11, 23–28; Am. CAC ¶ 44. No New York court has recognized such duties, and this Court should decline Plaintiffs' invitation to do so.

### a. New York Does Not Recognize a Duty of Constant Availability or Access to Unlimited Capital by Clearing Brokers

Plaintiffs have alleged that Apex owed a duty to "employ liquidity management practices" during the meme stock crisis. Br. 25; Am. CAC ¶ 107 (cited in Op. 31). But this allegation fails for several reasons.

First, New York law is clear that "[f]oreseeability should not be confused with duty. … The principle expressed in *Palsgraf v. Long Is. R. R. Co.* (248 N.Y. 339) [that a tortfeasor is responsible for the foreseeable effects of its tort] … is applicable to determine the scope of duty-only after it has been determined that there is a duty." *Pulka v. Edelman*, 40 N.Y.2d 781, 785 (1976). Thus, the question of whether the events of January 2021 were "reasonably foreseeable" is irrelevant *unless* Apex owed Plaintiffs a duty of care, and it does not. *See supra* Section I.B(1).

Second, under New York law, a stockbroker is permitted to not accept a customer's order, and Apex's contract specifically permits Apex to refuse to accept an order for any reason. *See Courtland*, 340 F. Supp. at 1080; *Busch*, 23 A.D.2d 189; *see also* Customer Agreement, Dkt. 491-3 ¶ 3. Thus, whether Apex should

40

have been compelled to remain open for business is governed by the contract. "It is settled under New York law that a tort claim will not arise 'where plaintiff is essentially seeking enforcement of the bargain.'" *Clarex Ltd. v. Natixis Sec. Am. LLC*, 2013 U.S. Dist. LEXIS 82632, at *16–17. Further, "[a]s a general rule, parties are free to enter into contracts that absolve a party from its own negligence." *Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*, 18 N.Y.3d 675, 682 (2012). Here, the very act Plaintiffs' claim constitutes negligence—refusing to accept new purchase orders of three Meme Stocks—is expressly allocated to Apex's discretion in the Customer Agreement. Customer Agreement, Dkt. 491-3 ¶ 3. Thus, even if Apex's temporary suspension of Meme Stock purchases were somehow "negligent," non-acceptance of customer orders was permitted by contract and therefore not actionable in tort. *See id.*; *Capital Options*, 1990 U.S. Dist. LEXIS 14736, at *18–19 (no duty on broker's part to use "less drastic alternative" or correctly guess future market events in imposing margin or other self-protective measures; "We are not equipped to second-guess, especially with the benefit of hindsight, the business judgments of professional traders and brokers regarding the risks associated with any given position or the volatility and direction of any future market movements.").

Third, the duty Plaintiffs ask this Court to create would impose an obligation on clearing brokers of constant availability for all investors, which further would imply a duty to have access to unlimited capital to meet NSCC and other regulators'

margin requirements. Although Plaintiffs misleadingly characterize the events of January 2021 as "reasonably foreseeable," Br. 27, Am. CAC ¶ 107, the SEC Staff Report on which Plaintiffs otherwise rely made clear that January 27, 2021 saw "record volumes" cleared at the NSCC, which triggered increased margin calls. SEC Staff Report, Dkt. 494-2 at 33. Plaintiffs ask this Court to transform clearing brokers into public utilities by imposing a duty to stay open for business, no matter how unprecedented the trading volumes or volatility of the markets. *Contra Busch*, 23 A.D.2d 189.

### b. New York Does Not Recognize a Clearing Broker Duty to Safeguard Plaintiffs' Investments

Plaintiffs next allege that Apex owed them a duty of "reasonable care in safeguarding the investments of Plaintiffs." Am. CAC ¶ 108, cited in Op. 31; Br. 27. No court has imposed such a far-reaching duty on clearing brokers—and indeed such a duty would be impossible to apply. *Dercole*, 2005 U.S. Dist. LEXIS 59757, at *11 ("A holding that clearing firms incur fiduciary obligations every time they act beyond the scope of their limited role of processing trades and maintaining records would place such firms in an untenable position."); *de Kwiatkowski*, 306 F.3d at 1302 ("[A] broker ordinarily has no duty to monitor a nondiscretionary account"); *see also supra* Section I.A.4.

Plaintiffs allege that Apex acts as a clearing broker for over a hundred introducing brokers (Am. CAC ¶ 1), and they estimate that members of the sub-

classes (one of which is Apex's introduced customers) number in the "hundreds of thousands if not millions." Am. CAC ¶ 99. As such, by Plaintiffs' own allegations, Apex clears both sell and buy orders for the same securities from hundreds of thousands of introduced customers. Apex's position in the market thus precludes it from owing any duty to "safeguard[] the investments of Plaintiffs" or otherwise pick sides in transactions it clears. Br. 27, Am. CAC ¶ 108; Op. 31 (holding Plaintiffs' assertion "runs contrary to New York law."). Apex is not Plaintiffs' fiduciary, and any obligations for accepted orders that Apex has to Plaintiffs "end after each transaction is done." *de Kwiatkowski*, 306 F.3d at 1302; *id.* (the client "has no legal claim on the broker's ongoing attention").

### c. New York Does Not Recognize a Clearing Broker Duty to Plaintiffs to Abide by FINRA Regulations

Finally, Plaintiffs allege that FINRA regulations create an actionable tort duty and "responsibility for fair dealing" that Apex owes to Mr. Jang and Mr. Chavez. Am. CAC ¶ 44, cited in Op. 32. But FINRA regulations do not create a private cause of action and, absent a private cause of action, do not create an independent duty that is not otherwise found in New York common law. *Fox v. Lifemark Sec. Corp.*, 84 F. Supp. 3d 239, 245 (W.D.N.Y. 2015) ("FINRA does not provide a private right of action, thus even if defendants violated FINRA rules, plaintiff cannot recover for negligence based on the alleged violation of FINRA Rule 2310(b)(2)(B)."); *accord Mraz v. JPMorgan Chase Bank, N.A.*, 2018 U.S. Dist. LEXIS 75217, at *14

n.4 (E.D.N.Y. May 3, 2018) (same). The sole New York State case Plaintiffs cite recognizes as much—as do Plaintiffs. *See* Br. 30 ("[A] violation of industry standards, did not, in itself give rise to a private cause of action") (citing *Eva Rioseco and Nilda Cruz v. Gamco Asset Management, Inc.*, 2011 N.Y. Misc. LEXIS 7279 at *79–80 (N.Y. Sup. Ct. Sept. 23, 2011). "Plaintiff cannot circumvent the lack of a private right of action for violations of industry rules merely by recasting her claim as a violation of a common law duty." *Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 645 (S.D.N.Y. 2020).

The cases Plaintiffs cite (Br. 30) are not to the contrary as each merely reflects that, *once a duty has been established* existing rules and regulations can be used as evidence of a standard of care. *See, e.g.*, *Eva Rioseco and Nilda Cruz v. Gamco Asset Management, Inc.*, 2011 N.Y. Misc. LEXIS 7279, at *79 n.22, *79–80 (N.Y. Sup. Ct. Sept. 23, 2011) (defendant "as Plaintiffs' [i]nvestment advisor with discretionary authority, had fiduciary duties to Plaintiffs"; violation of FINRA and NYSE suitability rules do not give rise to private cause of action); *Scott v. Dime Sav. Bank of New York, F.S.B.*, 886 F. Supp. 1073, 1080–81 (S.D.N.Y. 1995) (duty existed because "relationship between [the parties] went well beyond the relationship of creditor and debtor"); *Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 465 F. Supp. 1233, 1236 (S.D.N.Y. 1979) (Plaintiff did not bring a state law negligence claim).

Plaintiffs seek to hold Apex liable under a post-facto March 2021 FINRA Notice. Br. 10–11, 24–25. But FINRA acknowledges that: "Member firms are not obligated to receive or accept orders from customers where the firms believe that the associated compliance or legal risks are unacceptable" and "there may be situations where firms determine they must . . . restrict the entry or acceptance of customer orders to limit the firm's exposure to extraordinary market risk." Fin. Industry Reg. Authority (FINRA), Reg. Notice (21-12), *Customer Order Handling, Margin and Liquidity*, at 3 (Mar. 18, 2021), available at https://www.finra.org/sites/default/files/2021-03/Regulatory-Notice-21-12.pdf.

As the Second Circuit explained, "[i]t may be that noncompliance with internal [rules or industry] standards could be evidence of a failure to exercise due care, *assuming however a duty as to which due care must be exercised*. But the assertion that Bear had an ongoing duty to exercise 'due care' or 'behave like a reasonable broker,' breach of which could be evidenced by noncompliance with internal rules, cannot be squared with the cases holding that a broker's obligations to a nondiscretionary client arise and are satisfied transaction-by-transaction." *de Kwiatkowski*, 306 F.3d at 1311 (emphasis added).

### 3. The Economic Loss Doctrine Serves as an Independent Bar to Plaintiffs' Negligence Claim

The economic loss doctrine also precludes Plaintiffs from recovering in tort for purely economic losses "based on expectancy interests created by contract."

*AMBAC Assurance Corp. v. US Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 159 (S.D.N.Y. 2018) (a defendant cannot be held "liable in tort for purely economic loss unless the plaintiff demonstrates that the defendant owed a duty, which 'may arise from a special relationship[,] . . . to protect against the risk of harm to plaintiff'") (citing *532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292 (2001) (dismissing negligence claims where "based on economic loss alone fall beyond the scope of the duty owed")). Plaintiffs here are bound by a contract that specifically governs whether and when Apex may refuse to accept trades from introduced customers. Customer Agreement, Dkt. 491-3 ¶ 3. For that reason, any negligence claim for damages arising from Apex's refusal to accept certain trades must be dismissed. *See AMBAC Assurance Corp.*, 328 F. Supp. 3d at 159 ("This doctrine rests on the principle that economic losses arising from injury to expectancy interests created by contract ought to be brought as contract claims … .").

Plaintiffs devote several pages to assailing the District Court's application of the economic loss doctrine, even to the point of criticizing the District Court's sentence structure. *See* Br. 35–42. But Plaintiffs fail to grapple with the central failure of their claim. For Plaintiffs to assert a claim that avoids the economic loss doctrine here, they plausibly must allege the violation of a "distinct, extra-contractual duty." Br. 39 (quoting *AMBAC Assur. Corp.*, 2022 U.S. Dist. LEXIS 179380 (S.D.N.Y. 2022) at *56–57). But Plaintiffs cannot allege that a failure to

clear trades violates any extra-contractual duty when the Customer Agreement permits Apex to "refuse to execute" trades "at any time and for any reason." Customer Agreement, Dkt. 491-3 ¶ 3; *See also* Br. 39 ("Plaintiff has not asserted contract claims in this case" just breach of good faith and fair dealing).[10]

To avoid the economic loss doctrine, Plaintiffs try to invoke the "special relationship" exception that permits negligence actions for purely economic losses where the defendant and the plaintiff have a "special relationship" that creates a duty to protect against the risk of harm to Plaintiff. Br. 40–41, citing *AMBAC Assurance Corp.*, 328 F. Supp. 3d at 159. Plaintiffs seek to establish a "special relationship" between Plaintiffs and Apex by rehashing their argument that Apex was Plaintiffs' fiduciary. *Id.* But, as discussed above, Apex is not Plaintiffs' fiduciary. *See supra* Section I.A. As Plaintiffs have alleged no plausible facts that would support the existence of the necessary "special relationship," their claims for purely economic losses are barred by the economic loss doctrine.

### C. Apex's Express Contractual Right to Refuse Trades in the Customer Agreement Precludes the Imposition of a Duty of Good Faith and Fair Dealing to Accept All Trades

Plaintiffs unable to claim that Apex breached the Customer Agreement in any way, instead resort to claiming that the agreement implies a duty of good faith and

---

[10] The District Court properly declined Plaintiffs' invitation to certify a question to the New York Court (Br. 40), because there is no unsettled question of New York law here.

fair dealing (Br. 39) that Apex breached by "restricting one-sided trading (purchases) on January 28, 2021."  Am. CAC ¶ 127.  But Plaintiffs' claim contradicts the plain language of the Customer Agreement which provides Apex with "the right to refuse to execute securities transactions for the Customer *at any time* and *for any reason*." Customer Agreement, Dkt. 491-3 ¶ 3 (emphasis added).  Judge Altonaga correctly held that under New York law, the duty of good faith and fair dealing has not been implied broadly to "nullify other express terms of the contract, or … create independent contractual rights"—which is exactly what Plaintiffs seek to do here. Op. 35 (citing *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Xerox Corp.*, 25 A.D.3d 309, 310 (N.Y. Sup. Ct. App. Div. 2006)).

The New York Court of Appeals has held that "[n]o obligation can be implied … which would be inconsistent with other terms of the contractual relationship." *Murphy v. Am. Home Prods. Corp.*, 58 N.Y.2d 293, 304 (1983).

And the New York Court of Appeals just recently reiterated *Murphy's* holding in answering a question of New York law certified to it by the 11th Circuit.  *Cordero v. Transamerica Annuity Serv. Corp.*, No. 21, slip op. at 2 (N.Y. 2023).  In *Cordero*, the New York Court of Appeals considered: "whether, under New York law, defendants 'had a duty to enforce the anti-assignment language' pursuant to the implied covenant of good faith and fair dealing."  *Id. at* 3 (internal quotations omitted).  New York's highest court answered in the negative, explaining that "to

plead a valid cause of action for breach of the covenant of good faith, a plaintiff must allege facts sufficient to demonstrate that the plaintiff 'reasonably understood' the contract or contractual provision at issue to state a duty to take or refrain from taking a particular action." *Cordero*, slip op. at 3. Thus, in *Cordero*, the New York Court of Appeals refused "create an implied fiduciary duty" to protect the Plaintiff, where no such duty was contemplated in the contract. *Id.* at 4.

Here, the Customer Agreement expressly permits Apex to refuse to execute trades "at any time" and "for any reason." Customer Agreement, Dkt. 491-3 ¶ 3 ("You [Apex] have the right to refuse to execute securities transactions for the Customer at any time and for any reason."). That express right is not limited in the contract, and for good reason. Apex bears the risk, for example, that the customer will not pay for the stock purchased during T+2 days that it takes for a securities transaction to settle. *See* Bodson Testimony at 1; Henry F. Minnerop, *The Role and Regulation of Clearing Brokers*, 48 BUS. LAW. 841, 844-45 (1992). For that reason, it is of vital importance that Apex have tools at its disposal to manage that risk including by refusing trades. *See, e.g.*, SEC Jan. 30, 2021 Investor Bulletin; *Busch*, 23 A.D.2d at 190; *Courtland*, 340 F. Supp. at 1079–80. *Accord Hand*, 889 S.W.2d at 495.

## II. THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' TORTIOUS INTERFERENCE CLAIM FOR FAILURE TO ALLEGE "WRONGFUL CONDUCT"

Plaintiffs argue they have made out a claim for tortious interference with a "nonbinding" business relationship under New York law.  Br. 55–56.  Plaintiffs appear to be seeking to assert a claim for tortious interference with prospective economic relations, but they fail to do so.  "Where there has been no breach of an existing contract, but only interference with prospective contract rights . . . plaintiff must show more culpable conduct on the part of the defendant."  *NBT Bancorp v. Fleet/Norstar Fin. Grp.*, 87 N.Y.2d 614, 621 (1996) (citation omitted).  Thus, under New York law, "[t]o state a cause of action for tortious interference with prospective contractual relations, a plaintiff must plead that the defendant directly interfered with a third party and that the defendant either employed wrongful means or acted 'for the sole purpose of inflicting intentional harm on plaintiff[].'"  *Posner v. Lewis*, 18 N.Y.3d 566, 570 n.2 (2012) (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004)).

Plaintiffs do not allege Apex acted with a sole purpose of inflicting intentional harm on Plaintiffs (in fact just the opposite—they argue that Apex was worried about future collateral calls, Br. 14, n. 10).  *See Capital Options*, 1990 U.S. Dist. LEXIS 14736, at *16, *21.  And the New York Court of Appeals has limited "wrongful means" to "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure [beyond 'persuasion alone']."

*Carvel Corp.*, 3 N.Y.3d at 191 (quoting *Guard-Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 191 (1980)). Plaintiffs argue that the New York Court of Appeals "left open" the possibility of an exception for "egregious wrongdoing" that, while not a crime or tort, was so "culpable" that it could be the basis for a tortious interference claim. Br. 55; Op. 36. But what the court in *Carvel* actually said was that it had never before, and did not in that case, recognize "any other exception to the general rule," leaving that decision "for another day." *Carvel*, 3 N.Y.3d at 190–91. In the almost 20 years since *Carvel* was decided, that day has never come.

Moreover, in the very next sentence following the language above, the *Carvel* court made clear that "[t]he sort of 'more culpable' conduct we had in mind in *NBT* was described in *Guard-Life*," *Carvel*, 3 N.Y.3d at 190–91, which had described culpable conduct as "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure," *Guard-Life Corp.*, 50 N.Y.2d at 191. Because Apex has no duty to accept new orders, and because Apex retains the express contractual right to decline to accept trades at any time and for any reason, its exercise of that contractual right cannot constitute "wrongful conduct" or serve as a predicate for a tortious interference claim. *See, e.g., Capital Options*, 1990 U.S. Dist. LEXIS 14736, at *20 (broker allowed liquidation of accounts but "refused to accept its [customer's] orders for new positions"; no broker duty to accept new positions because "the execution of new contracts exposes the

broker, as well as the customer, to new financial risks" and "[o]ne party should not be able to impose risks on the other without the other's consent") (quoting *French*, Comm. Fut. L. Rep. ¶ 20,444 at *13 (which in turn had relied on *Busch* and *Galigher*)); *id.* at *20–21 (no violation of Illinois tortious interference law).

This Court, exercising its diversity jurisdiction, should not impose a duty that the New York courts have not imposed. In any event, as Plaintiffs also have failed to allege a claim for negligence or breach of fiduciary duty, those claims cannot serve as the wrongful conduct necessary to salvage Plaintiffs' tortious interference claim. And so for that additional reason, this Court should affirm the dismissal of Plaintiffs' tortious interference claim.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DISMISSED PLAINTIFFS' FOURTH COMPLAINT WITH PREJUDICE

Plaintiffs had access to tens of thousands of pages of pre-pleading discovery, Order, Dkt. 323, and three separate opportunities to respond to Apex's arguments. The Court even warned Plaintiffs it would not give them further leave to amend. Order, Dkt. 450. Plaintiffs even have had the benefit of the District Court's ruling on a similar claim against Robinhood. Order, Dkt. 453.

After providing so many opportunities for Plaintiffs to amend the complaint, there simply is no set of facts Plaintiffs could allege that would change the outcome of this case. *See Imperato v. Navigators Ins. Co.*, 777 F. App'x 341, 344 (11th Cir.

2019) ("[A] district court need not give a plaintiff the opportunity to amend his complaint where it would be futile.").

## CONCLUSION

For the foregoing reasons, Defendant respectfully submits that the District Court's judgment of dismissal with prejudice should be affirmed.

Respectfully Submitted,

/s/ J. Mark Gidley
J. Mark Gidley (DCB 417280)
701 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 626-3600
mgidley@whitecase.com

Angela Daker (FB 681571)
200 South Biscayne Blvd.
Suite 4900
Miami, FL 33131
Telephone: (305) 995-5297
adaker@whitecase.com

Jack E. Pace III (NYSB 2947372)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
jpace@whitecase.com

*Counsel for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) as the brief contains 12,814 words, excluding those parts exempted by 11th Cir. Local R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

/s/ *J. Mark Gidley*
J. Mark Gidley (DCB 417280)

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2023, four (4) copies of this brief were dispatched for delivery to the Clerk's Office of the United States Court of Appeals for the Eleventh Circuit by third-party commercial carrier for overnight delivery at the following address:

> David J. Smith
> Clerk of Court
> U.S. Court of Appeals for the 11th Circuit
> 56 Forsyth St., N.W.
> Atlanta, Georgia 30303

On this same date, a copy of the brief was served on all counsel of record via CM/ECF.

*/s/ J. Mark Gidley*
J. Mark Gidley (DCB 417280)
